John A. MAXWELL and Algonac Manu-
facturing Company, a Michigan cor-
poration, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 13689.

United States Court of Appeals
Sixth Circuit.

March 29, 1960.

As Amended June 2, 1960.

William Cohen of Cohen & Cohen, Detroit, Mich., for appellants.

Orrin C. Jones, Asst. U. S. Atty., Detroit, Mich., Fred W. Kaess, U. S. Atty., Detroit, Mich., on the brief, for appellee.

Before McALLISTER, Chief Judge, SIMONS, Senior Circuit Judge, and CECIL, Circuit Judge.

McALLISTER, Chief Judge.

This is an appeal by John A. Maxwell and the Algonac Manufacturing Company from a judgment of conviction in a criminal case.

Mr. Maxwell was sentenced to three years' imprisonment and fined $30,000.00. The company was also fined $30,000.00. After a consideration of the record on appeal, we are clearly of the view that the judgment of the District Court should be reversed, the convictions set aside, the fines cancelled, and appellant Maxwell discharged. Our determination in such a grave matter calls for the recapitulation of the evidence and the reasoning which compels us to our conclusion. At the outset, it is to be said that this is a factual case and our reversal of the judgment is based upon either the uncontradicted evidence, or the testimony of witnesses for the government.

The background of the case is as follows:

The Algonac Manufacturing Company, through its President, John A. Maxwell, in 1952, entered into eight contracts with the government to manufacture and deliver various metal cabinets and steel boxes, aggregating 49,922 units, of the total value of $1,427,355.42. Under one of the contracts, deliveries were made of 6,100 of the 6,900 cabinets ordered, of a value of $210,000.00, and, under another contract, $20,000.00 worth of items were delivered. It appears that there was some delay, at first, in production because of steel shortages and a steel strike; later, there were two tornadoes, which damaged the plant and necessitated clearing up the premises; this was followed by a fire at the Algonac plant which interrupted production for a period of from two to three months, and required a rebuilding of the plant. Commencing on October 2, 1953, the Algonac Manufacturing Company received notice from the government that certain contracts had been defaulted, and, later, notices of default on the other contracts were received, and Algonac was ordered to stop immediately all production.

In the notices of default, the government stated that if it were subsequently determined that failure to deliver the items was due to causes beyond the con-

trol of the company and without its fault or negligence, the notices of default could be deemed to have been issued pursuant to the provisions of the contract clause covering "termination for the convenience of the government." At the time the first notice of default was received, it appeared not only that appellant Maxwell had invested considerable capital in the company, but that there were, then, current liabilities against the company of approximately $450,000.00. A conference was arranged with the Army Ordnance Department to discuss the matter. At the meeting with the government officials, Mr. Maxwell stated that he stood to lose a half million dollars, whereupon one of the representatives of the government replied that it would be cheaper for the government to pay a half million dollars rather than to take a million and a quarter dollars worth of materials which it did not need, as well as pay the freight and storage on them.

After considerable discussion, the result was that the government, instead of terminating the contracts because of default of the Algonac Manufacturing Company, elected to proceed under the "termination for the convenience of the government" clause in the contract; and a letter was issued to this effect, informing the company that all the contracts would be lumped into one for procedural purposes.

One of the simplest but most important considerations, in understanding this complicated case, is that the contracts entered into between the Algonac Manufacturing Company and the government were *fixed-price contracts*. The reason that this is such an important consideration is that the indictments and proof of the government rest largely on bookkeeping entries. If the contracts had been cost-plus contracts, the bookkeeping and accounting methods of the company would have been entirely different, inasmuch as it would have been necessary to prove the actual cost incurred in manufacture in order to secure the "plus" profit. In the instant case, if the company had been permitted to complete the contracts, it would have received from the government only the fixed price upon which the parties had previously agreed, and it would have been unnecessary to furnish the cost items such as the company would have been obliged to supply in the case of cost-plus contracts. As it was, the books of the company were not set up to show the cost of the various items manufactured. When the contracts were terminated "for the convenience of the government," there were no items on the books of the company which would indicate the expense incurred for each of the different articles manufactured, and to be manufactured.

The government did make payments for the materials actually delivered by Algonac in the amount of $220,000.00. Thereafter, Mr. Maxwell, on behalf of the company, filed a termination claim in which it was set forth that there was due to the company from the government the amount of approximately $469,000.00. The government paid $200,000.00 as a partial payment on account of the termination claim.

Subsequently, the Algonac Manufacturing Company and Mr. Maxwell were indicted for making false statements in a balance sheet—after the contracts had been terminated—as part of the submission by appellants to the government of the termination claim and settlement proposal made for the purpose of securing payment of such claims against the company, in violation of Title 18 U.S.C.A. § 1001, and Title 18 U.S.C.A. § 2(a), as well as for conspiracy to file such false termination claim and settlement proposal in violation of Title 18 U.S.C.A., § 371.

Appellants were first indicted on a four-count indictment, No. 34457, on August 26, 1954, charging that they falsified the records of the company, showing greater assets and less liabilities than was the actual fact, in a financial statement to the government; and that they falsely stated the company had a surplus, when it actually had a deficit.

Thereafter, upwards of a year later, on July 29, 1955, appellants were again

indicted in a nine-count indictment, No. 35038, charging that they doctored the books of the company, concealing the company's financial condition, to indicate its assets were greater, and its liabilities less, than was actually the case; that they had used inferior materials and workmanship contrary to the specifications, and that they had made false financial statements, schedules of accounting, and settlement proposals.

On March 9, 1956, an order was entered by the District Court, consolidating both indictments, No. 34457 and No. 35038, for trial purposes. After various motions made by appellants were denied, the case proceeded to trial before the court without a jury.

Most of what the government charged could not be proved; and many counts and paragraphs of the indictments were, after the proofs, dropped by the government or dismissed by the court upon the motion of appellants. Thus, at the conclusion of the government's case, the District Attorney announced that there would be no proofs offered in reference to any of the four counts in the first indictment, No. 34457, which was returned in 1954.

With reference to the second indictment, No. 35038, returned in 1955, the District Attorney announced that no proofs would be offered as to counts 7 and 8 of that indictment.

Appellants then moved for a judgment of acquittal; and the court entered such judgment as to appellants in all of the four counts of indictment No. 34457, as well as counts 7 and 8 of indictment No. 35038. The court further granted the motion of defendants for a judgment of acquittal on counts 1, 2 and 3 of indictment No. 35038, and, on motion of appellants, struck and dismissed sections (a), (b), (c), and (e) of paragraph 3 of count 6 of indictment No. 35038. Appellants then moved the court to strike further

sections of the counts of indictment No. 35038 and the court granted such motion and dismissed subsections (b) and (c) of paragraph 4 of count 5 of such indictment.[1]

In brief, nine of the thirteen counts of the two indictments were dismissed, as well as five important sections of the remaining four counts.

The case then proceeded to trial before the court without a jury. In a long and detailed verdict, the District Court found appellants Algonac Manufacturing Company and John A. Maxwell guilty of counts 4, 5, 6 and 9 of indictment No. 35038, and thereafter sentenced appellant Algonac Manufacturing Company to pay to the government a fine in the amount of $7,500.00 on each of the said four counts, and further sentenced appellant Maxwell to be committed to the custody of the Attorney General for a period of three years, and that he pay a total fine in the amount of $30,000.00.

The government contends that appellant Maxwell submitted a false financial statement, a false schedule of accounting information, and a false settlement proposal, with intent to defraud the government, and conspiracy so to defraud. It is contended that the false financial statement was submitted by appellant Maxwell to the government on February 7, 1954; that the false schedule of accounting information was submitted by Maxwell to the government on March 31, 1954; and that the final settlement proposal containing the false statement was submitted to the government on March 31, 1954.

It is Maxwell's submission of these three alleged false statements, and conspiracy thereby to defraud the government, that constitute the four counts of the indictment upon which appellant Maxwell and the company were tried.

The facts out of which these proceedings arise are necessary to an under-

---

1. While these paragraphs were not dismissed in their entirety, the principal part was dismissed and, for practical purposes, the paragraphs may be considered as dismissed, since the other portions thereof are dealt with elsewhere in this opinion.

standing of the issues and contentions of the parties: Appellant Maxwell bought the Algonac Manufacturing Company sometime in the early part of 1947. At that time it was a partnership, and Mr. Maxwell thereafter incorporated the business, and became the sole stockholder, as well as President and Treasurer. Edward Y. Howell, who had been associated with the partnership, remained with the company after its incorporation and subsequently became Secretary. John K. McDermott became associated with the company after its incorporation, and was elected Vice President.

Appellant Maxwell had considerable experience in corporate management, having been prominently associated with the management of a number of other corporations prior to his purchase of the Algonac Manufacturing Company. He was a man of good reputation and standing in the business community of Detroit. During the course of the business of the Algonac Manufacturing Company, Maxwell constituted Howell Office Manager, in charge of the bookkeeping; and McDermott became the manager in charge of production.

In performing its contracts with the government, the plant of the Algonac Manufacturing Company had to be adapted to manufacture the items contracted for. This required production of dies, tools, fixtures, and similar equipment, and preproduction labor costs, such as plant rearrangement, tables, racks, samples, and preliminary tooling to put the job in production.

As a preliminary observation, it is to be repeated in this connection that when the contracts were terminated by the government, the Algonac Company's current liabilities were in the neighborhood of $450,000.00. On December 11, 1953, Algonac filed an application for partial payment, setting up a claim for $447,814.71, of which $247,990.60 was for tools, dies, jigs, etc. After Mr. Marino, a government expert, went out to the offices of the company and made an examination of the books, the government paid $200,000.00 to Algonac in par-

tial payment of the claim. It is not now contended by the government that it did not owe this $200,000.00 to Algonac and it is not even suggested by the government that it does not owe Algonac—as claimed by Mr. Maxwell—several hundred thousand dollars more on this account, at this very time.

The fact that the government paid Maxwell—or his company—$200,000.00 on a claim of $447,814.71 (embodying the item now claimed to be fraudulent) is not technically an answer to the government's claim of Maxwell's making a false statement as to the expense allocated to each item in the contracts. But we cannot escape wonderment that the government has never since claimed that the $200,000.00 which it paid Maxwell on the contracts was induced by fraud, or, further, that the government does not claim, at the present time, that it does not owe him, or his company, the balance now claimed by Maxwell in an amount of $318,180.57.

We come, then, to the crucial question in the case—the claim of the government that Maxwell made a deliberately false statement to the government as to the time allocated by the company to the "dies, tools, jigs and fixtures." Although, as said above, the government, after termination of the contracts, was sufficiently satisfied with the examination of Algonac's books to make a partial payment of $200,000.00 on Algonac's claim filed in December, 1953, in the amount of $447,814.71, and has never questioned that payment, or sought to recover it or any part of it, counsel for the government now contend that the financial statement of February 7, 1954, submitted by Maxwell on behalf of the company, was false in that Maxwell and the Algonac Manufacturing Company "did knowingly and wilfully falsify, conceal, and cover up, by trick, scheme or device, certain material facts; that is to say, they did falsify, conceal and cover up, and did cause to be concealed and covered up, and did aid, abet, counsel and induce the concealment, covering up and falsification of the fact that said

statement was not true and correct and in accord with the books and records of the Company, in that Tools, Dies, Jigs and Fixtures are shown as $252,355.72, when in truth and in fact the Company's books do not show such item."

The emphasis in the above language in count 4 of the indictment is upon the fact that the statement was not true and in accord *with the books and records of the company* and that the books do not show such item; and the same is to be said of the remaining counts, 5, 6, and 9, where the primary emphasis is on the fact that the statements therein contained were not only fictitious, but not in accord with the books and records of the company.

It was admitted by Maxwell repeatedly on the trial that the *books* did not show that item; and it was explained over and over again by appellants' witnesses, as well as the government witness, that, in the words of Harold Larsen, the government's expert accountant, from the Federal Bureau of Investigation, that "as far as the records [of the Algonac Company] are concerned, they were maintained in, I believe, good order. (*), [For] the purposes of the company I think they were all right." Mr. Larsen further testified:

"Q. Do you think for the purposes of the company it was all right not to have any records which would show what the die cost on any particular job was going to be? A. For their purpose, when they had a straight fixed price contract, they took the contract on the assumption that they were going to complete the contract, and it would not make any difference to them, insofar as the costs of the individual dies were concerned, as long as at the conclusion of that contract they were able to show a profit. This is the ultimate objective in the business.

"Q. * * * It was not necessary for them to keep the same type of books and the same type of cost accounting that they would have to keep if it were a cost-plus or a 10%,

or something of that kind? A. That is right.

\* \* \* \* \* \*

"Q. Could you find any place in any of the records of the Algonac Manufacturing Company where they kept any cost accounting, real cost accounting, so that they could tell the cost of the various items and various jobs? A. Insofar as being able to tell a unit cost, or the cost of a particular contract, my answer would have to be no.

"Q. Did you ever find in their cost system a breakdown between the cost of dies and fixtures, and a breakdown between production work, production labor? A. Not according to their books, no."

There was no place in the books of the company where the so-called "die items" appeared—although it is admitted by the government that many thousands of dollars were properly attributable to these items.

The fact that the tool and die item did not appear on the books of the company until the balance sheet "as of December 31, 1953" is of no significance whatever. Until the contracts were terminated for the convenience of the government, this item was simply charged off as expense, and there would be no need to show such an item, for if the government had permitted the performance of the contracts, it would have paid the company the contract price, with no requirement on the part of the company to show any costs incurred, since the contracts were on "a fixed-price basis."

Everyone in the case knew that this item was not on the books of the company. That fact could have been perceived by a novice bookkeeper in a superficial examination.

Why, then, did it become necessary subsequently to show such an item?

When the contracts were first defaulted by the government, Maxwell stated— and there is no reason to disbelieve him— that "it struck a panic" in him. He had invested a great deal of capital in the

company and at that time its current liabilities amounted to $450,000.00. He, therefore, arranged a meeting with the responsible officials of the government to discuss the defaults; and it is undisputed that, at the meeting, he tried to convince the officials to allow him to finish the contracts; and he was interested in continuing with the contracts with them; he was not, at that time, even primarily interested in having the contracts changed from "default" to "termination for the convenience of the government." Termination for the convenience of the government would entitle Maxwell's company to the expenditures made on the contracts, with 10% profit. But completion of the contracts would not limit the profit to 10%, but would entitle the company to the profit on which it had counted when the contracts were executed.

The government officials, however, felt that it would be better for the government to terminate. When, at the close of the conference, Maxwell stated that he stood to lose half a million dollars, Mr. Asquith, the Branch Chief of the Detroit Arsenal Department, remarked that it would be cheaper for the government to pay the half million dollars rather than take a million and a quarter dollars' worth of materials they did not need and pay the freight and storage on it.

At the meeting, Mr. Maxwell was informed by the government officials to forward a letter under the default "condition" of the contract, stating why the contracts should not be defaulted. After the meeting, a series of comprehensive letters were exchanged between the government and Algonac, with the result that Algonac finally received a letter on November 25, 1953, to the effect that the government had elected to proceed under the "termination for the convenience of the government" clause in the contract. In a subsequent letter, it was stated by the government that all of the contracts would be lumped into one for procedural purposes.

Immediately after receiving the letter of November 25, 1953, in which the government had elected to proceed under the "termination for the convenience of the government" clause, Maxwell met with the officials of the Detroit Ordinance District. At this meeting which Maxwell attended on behalf of the Algonac Company, the government was represented by Mr. Stanley, Contracting Officer; Mr. Stone, of the Legal Department; Mr. Marino, of the Price Analysis Office, and Mr. McMullen.

During the conference, Maxwell was given various forms to fill out and told to contact Mr. Stanley in the future if there was any phase of the matter he did not understand; and he was informed that, if there was any dispute or misunderstanding, "Mr. Stanley would be the last word."

Mr. Maxwell testified:

"Q. Later on, did you have discussions with Mr. Stanley or anyone else in reference to the fact that you had no itemized die costs on your books?

"A. I did. I had a discussion with Mr. Stanley at that time I picked up these forms, * * * and certain questions that were on the back of it, I said, 'We can't answer these questions' and they said, 'Answer them to the best of your ability. You are not required, or it is not a requirement that these answers be exactly as stated. If you think it, if you think you had certain things that are differentiated, let us know, and put in the answer to the best of your ability and there will be a conference, and this conference at the termination.' This conference was supposed to be ultimately set, but which ultimately never was kept, they would discuss these differences, and wherever we varied we could make the adjustments; and then there was to be a last termination form, which was really never filed."

One of the printed requests, on the back of the form of the "Settlement Proposal" which the government officials gave to Mr. Maxwell, and which he referred to, in the foregoing testimony,

was for information as to "other costs" in "Item 7." Mr. Maxwell answered by filling the blank for such purpose as follows: "Preproduction labor cost, such as plant rearrangement, tables, racks, samples, preliminary tooling to put jobs in production included in item 7 (which consisted of dies, jigs, fixtures and special tools) or a total of $252,355.72. Engineering, etc. included in Burden of 103.6%." In the "Termination Inventory Schedule"—a part of the "Settlement Proposal" documents—Maxwell attached a statement with reference to "Die Fixtures, etc.," stating: *This is an estimated cost on all Tools, etc. as no individual cost on each die was kept and plant rearrangement, preliminary tooling, samples, assembly tables, special trucks and etc. is all in this figure of $252,355.72."*

Mr. Stanley, the Assistant Contracting Officer of the Detroit Ordnance District, was called by the government in rebuttal of Mr. Maxwell's testimony. Instead of rebutting anything that Mr. Maxwell had testified to, Mr. Stanley not only corroborated him, but augmented his testimony, and added considerable weight to everything Mr. Maxwell had said. Mr. Stanley, called as a government witness against Mr. Maxwell, displayed complete frankness, and testified that he had had under his supervision, as Contracting Officer, the eight contracts with the Algonac Manufacturing Company; that he had had numerous conferences with Mr. Maxwell, pertinent to the termination of the contracts, from the first part of October, 1953, until after January, 1954; that the subject matter of some of the conferences was with reference to *questionable areas* as to how to proceed under termination, and an endeavor on the part of Mr. Maxwell to get some guidance as to how to proceed in such questionable areas; that there were two matters which seemed to be bothering Mr. Maxwell, one item for die shoes, and the other, an item for attorney fees. Although the amounts of these items were not mentioned to Mr. Stanley, they aggregated $35,000.00 each.

Mr. Stanley testified:

"We followed the pattern of counseling with our contractors when they are involved in a termination in order to instruct them how to proceed. In this instance here, I recall advising Mr. Maxwell that if he felt strongly enough about those costs, and that they were directly allocable to the termination, that it would be satisfactory to put them in. There were no amounts discussed, but merely the items themselves. * * * I think on one occasion Mr. Howell was present when there was a discussion on either the die shoes or the attorney's fees. I think it was at the time they were discussing the die shoes issue at the time. * * It is my recollection that the [attorney's fees] item was mentioned in our various meetings and conversations; and in a general manner he was advised that such costs, if they pertained to the termination, were permissible to be submitted in the form of his claim; but no amounts were discussed at that time, but it was just the general treatment of the element.

"The Court: He was advised similarly with respect to both the attorney fee item and the die shoes?

"A. Yes, your Honor."

On cross-examination, Mr. Stanley further testified:

"Q. Mr. Stanley, you stated that Mr. Maxwell went into the elements of the charges for the attorney fees and die shoes, which seemed to be bothering Mr. Maxwell, and you told him that if he felt strongly enough about those costs that he should put them in? A. That is correct, sir.

"Q. Now, isn't it true that anything that goes into a termination proposal is subject to adequate substantiation? A. That is right, sir.

"Q. That means that if a settlement proposal is filed with your office that you have means and methods and people to check over every

figure that goes into that, is that correct? A. We do, sir.

"Q. Now, in the event that there is a dispute between the people who do the checking, a dispute between them and the company, do you have means for negotiations? A. Yes, we do. If I am permitted, I would like to cover that area. In the normal termination proceedings, *any costs submitted by a contractor are subjected to a complete audit by Army.* Now, in that process certain areas are bound to be discovered that cannot be fully substantiated at the time. Those are set aside for consideration by the contracting officer, and a basis for negotiation on those points.

"Q. One other question. Suppose there is a dispute as to the question of dies. Suppose we have a die schedule here where you people accepted some and rejected others. Then, is the contractor given an opportunity of appearing before you? A. Yes, he has recourse to the disputes provision in the contract.

"Q. That disputes provision in the contract was never utilized in this particular case? A. No, it never reached that stage.

"Q. Was that due to the fact that your office received orders from higher echelon to discontinue negotiations with Maxwell? A. That is right, sir."

From the above, the conclusion is inescapable that Mr. Maxwell discussed the important items in this case relating to the attorney fee of $35,000.00 and the die shoe item of $35,000.00 and was advised that if he felt strongly enough about those costs and they were directly allocable to the termination, that it would be satisfactory to put them in his claim; that anything that goes into a termination proposal is subject to adequate substantiation and a checking over of every figure in the proposal, as well as a complete audit by the Army; and that if there is a dispute as to any question

tions such as the dies in this case, the contractor may have recourse to the "disputes provision" of the contract.

Moreover, the Government Regulations applicable to the settlement of terminated fixed-price contracts provide:

"A. S. P. R. 8–400. Scope of Part. This part establishes the guiding principles and policies in connection with that arriving at fair compensation for the settlement of terminated fixed-price contracts.
\* \* \*

"A. S. P. R. 401. General Standards for Use of Cost Principles.

"(1) The primary objective in negotiating a settlement is to agree on an amount to compensate the Contractor fairly and fully for the work done and the preparations made for the terminated portion of the contract, with such allowance for profit thereon as is reasonable under the circumstances.

"(2) Fair compensation for termination is inherently a matter of judgment and therefore cannot be measured exactly. In a given case, various methods may be equally appropriate for arriving at fair compensation, and differing amounts, resulting from reasonable variations of method and of sound judgment, may all be regarded as constituting fair compensation. The ability to apply standards of business judgment as distinct from strict accounting principles is at the heart of a negotiated settlement.

"(3) Cost and accounting data may provide guides for ascertaining fair compensation but are not rigid measures of it. Other types of data, criteria, or standards may furnish equally reliable guides to fair compensation. Settlement by agreement should be facilitated to the maximum extent feasible. The amount of record keeping, reporting, and accounting, in connection with settlement of termination claims, will be reduced to the minimum compatible

with the reasonable protection of the public interest."

In another portion of the Regulations, A. S. P. R. 8.503.1, Subsection C, it is stated:

"Where actual standard or average costs are not reasonably available, estimated costs may be used, providing the method of arriving at the estimate is reasonable and has the approval of the Contracting Officer. The Government will not require a Contractor to maintain unduly elaborate cost accounting systems for a fixed price contract merely because they may be terminated."

A reading of the government regulations discloses that in cases of *fixed price contracts,* it was assumed that the books of a company would be unlikely to reflect the contractor's costs as to the various items in the contract and that, accordingly, settlements with the contractor would be based primarily upon his estimates, subject to adequate substantiation, and that such "settlements should be facilitated, by agreement, to the maximum extent feasible."

Under this general subject, it is to be noted that during the closing argument in the case, government counsel contended that Mr. Maxwell had made a false statement when he signed the following certification of the Settlement Proposal, as set forth in the government form provided for that purpose:

"That he has examined the settlement proposal, and that to the best of his knowledge and belief the proposed settlement and supporting schedules and explanations have been prepared from the books of account and records of the contractor, in accordance with recognized commercial accounting practices. They include only these charges allocable to the terminated portion of this contract. They have been prepared with knowledge that they will or may be used directly or indirectly as the basis of settlement of a claim or claims against the United States or

an agency thereof, and the charges as stated are fair and reasonable."

The trial court, in view of the evidence, then intervened:

"The Court: Well, suppose he makes that statement, and yet the Government knows, when it is submitted, that that is not the case, they know the books do not show that, *and they have had some talk about that.* Would that be a false statement?

"Mr. Jones: I do not think it would make it any less a false statement.

"The Court: Well, suppose I take a statement to the Government, and I certify to certain things, and I hand it in, and I say, 'Now, here, let me go over this with you. Now, I have got an item down here of so-and-so; it says, the form says here that it is according to the books and records; that is your form; of course, that is your Government form there'——

"Mr. Jones: That is right.

"The Court: (Continuing) * * And I put it in there 'But my books do not show that. But I am just claiming that because I think that is right.' Would that be a false statement?

"Mr. Jones: Yes, I think it would."

We do not agree with government counsel, but, rather, in the light of the evidence, we are of the opinion that the proofs did not warrant Mr. Maxwell's conviction for making a false statement in certifying the Settlement Proposal, under the given circumstances.

In the light of our examination of the record of this case on appeal, it is puzzling to arrive at a conclusion as to how this criminal prosecution arose.

It apparently took by surprise not only Mr. Maxwell, but all of the Detroit Ordnance District officials concerned. From the evidence, it appeared that they all thought the matter was progressing toward a conference for settlement.

The government officials in charge of the terminated contracts had invited Maxwell to sit down with them to negotiate the differences and disputes, after they had received all of the documents with respect to the contracts which Maxwell had filed with them, and after they had told Maxwell why they objected to the Settlement Proposal, stating that "the termination inventory schedule for dies, jigs, fixtures, and so forth is determined unacceptable, due to insufficient information contained thereon to permit this office to properly identify the items, tooling listed for allocability. Your company is hereby directed to provide the necessary manpower to open each die and tool for identification. Upon proper identification it will be necessary to stamp [required] information on each die or tool."

It was understood by all of the government officials in charge of the contracts that the proposals which Maxwell had made for settlement were based upon estimates. But while Maxwell was waiting for a date to be fixed for conference and negotiations looking to a settlement of the claim, "higher echelon"—whoever that is—ordered that no further discussions be carried on with Maxwell concerning the terminated contracts. Neither Mr. Maxwell nor the officials of the government in charge of the contracts know who "higher echelon" is, or why "higher echelon" broke off all negotiations with Mr. Maxwell while he was still claiming $318,180.57 from the government as due on the terminated contracts, and while the government officials in charge of the contracts were exchanging views and carrying on correspondence with Mr. Maxwell in relation to the claim.

Someone in authority in the government—undisclosed up to the present time—evidently thought that because the books had not reflected the item of $252,355.72, and because of a certain so-called "card changing" project (relating to subsequent changes in work and time cards), that Mr. Maxwell was trying *in some way* to defraud the government. As a result, a grand jury suddenly subpoenaed the books and records of the company, and, presumably, after examining them carefully under the tutelage of government counsel, it returned, on August 16, 1954, the first indictment against Maxwell and the company, containing four counts. Nothing in this indictment was ever proved. In fact, it was dismissed a year after it was returned.

The above mentioned indictment was based on the charge that Mr. Maxwell had fraudulently concealed from the government the fact that the drawings and specifications of the steel tool cabinets which the company was making for the government had been changed without authority of the government; that inferior material was substituted in violation of contract drawings and specifications; that Mr. Maxwell had made a false statement on an invoice for $5,589.00 for steel tool cabinets, and a further false statement in an invoice for $1,518.00 for other steel tool cabinets. When the case came on for trial, nothing in this indictment could stand up, and, as mentioned, the court, on motion of Maxwell's counsel, dismissed the entire indictment for failure of the government to make any proof of its charges.

Nearly a year after this first indictment, and on July 29, 1955, another indictment, in nine counts, was returned against Mr. Maxwell and the company by a grand jury. Most of the frauds charged were claimed to have been committed by Mr. Maxwell's falsification of the books of the company, such as fraudulently decreasing the accounts payable by $40,000.00; falsely decreasing the surplus by $8,180.74; falsely showing $2,374.34 as cash on hand when, in fact, the bank account had been overdrawn; falsely increasing the inventories; making false statments as to surplus and deficits; falsely allocating steel to the terminated contracts; misrepresenting the steel as new, when, in fact, it was rusted and unusable; falsely misrepresenting the cost of dies manufactured by a subcontractor; falsely concealing that the items had not been made in accordance

with the contract drawings and specifications, but had been made with inferior materials. These were all grave charges of crimes committed against the United States.

All of the counts and paragraphs of counts containing these specific charges of criminal conduct were thrown out of the case by the District Court, when it dismissed such counts and sections charging the offenses above outlined in the preceding paragraph.

There remained, then, virtually, only two charges against Maxwell: that he had falsely misrepresented, in the financial balance sheet, schedule of accounting information, and settlement proposal, that the cost of tools, dies, jigs, and fixtures aggregated the sum of $252,355.72; and that Mr. Maxwell and the company were guilty of conspiracy in falsifying the termination claim, financial statement, and accounting schedule.

The government, in its brief before this court, and on the trial, continued to bear down hard on the argument that the "important false statements" which were made by Mr. Maxwell "relate to three large items, namely:

"$252,355.72 for dies, jigs and fixtures
"   35,000.00 for die shoes
"   35,000.00 for legal fees."

The chief contention of fraud as to the so-called "die item" of $252,355.72 was that this item *was not on the books of the company* at the time the claim was made on the terminated contracts, and that it was subsequently inserted in the company's books and was entirely fictitious. The government, in its brief on appeal, states, with emphasis:

*"It is undisputed that no such item was on the books of Algonac!"*

The government, in its brief, also quotes and emphasizes Howell's testimony in this regard:

*"Q. Was there any such item on the books and records of the company at the time you made out this statement?*

*"A. No, sir, there was not."*

Finally, the government, in its brief, quotes the following testimony of Mr. Larsen, Special Agent of the Federal Bureau of Investigation, as conclusive on the question of fraud, as follows:

"An examination of the books of the company revealed that the company did not have an asset account for tools, dies, jigs and fixtures. The only account with that caption is a manufacturing expense account; and as of December 31, 1953 the balance in that account was zero. According to that, the company had increased the current assets of tools, dies, jigs and fixtures by the amount of $252,355.72."

All of the foregoing has the superficial and delusive quality of appearing to prove conclusively that Mr. Maxwell was guilty of criminal fraud; but the fact is that it proves nothing of the kind.

The item for the dies, jigs, fixtures, die shoes, and legal fees customarily does not appear on the books of a company as assets, expenses, or costs, or under any other heading, *in a "fixed price contract."*

If the company had been permitted to perform the contracts, no one would ever have thought of such items, as they would have been completely unimportant. But as soon as the contracts were terminated for the convenience of the government, the costs of the dies, jigs, fixtures, the value of the die shoes, and legal expenses suddenly became of the utmost importance. For Algonac, although deprived of the profits it would have realized on the completed contracts, was immediately entitled to recover from the government the costs it incurred in carrying out the contracts up to the period of termination, together with a limited profit of 10%. Consequently, it is obvious that the expenditures for dies, jigs, and fixtures, as well as the value of the die shoes taken by the government and the legal expenses attendant on carrying out the contracts, were properly submitted as costs of the company, which the government was bound to pay, in spite

of the fact that they had not theretofore appeared on the books. The circumstance that they had not previously appeared on the books of the company was completely irrelevant; and there could not be the slightest inference drawn that such items were fraudulently set forth in the settlement proposal, because of the fact that they had not theretofore appeared on the company's books.

Even the trial court was for a moment misled on this very question by the claims and arguments of the government. Mr. Howell, called as a government witness, on cross-examination, testified with regard to the "die items."

"Q. Regardless of whether it was $252,000 or $126,000, they had some value, did they not? A. Yes, sir.

"Q. And even though they had a value, you did not carry them on the books of your company, is that it? A. That is correct.

"Q. But they were a part of the company's assets? A. Yes, sir.

*   *   *   *   *   *

"The Court: Well, what became of the cost of the tools and dies? He said they were made or purchased. Did they go in as an expense item immediately? Or how were they handled on the books and records? *   *   * That was used as a cost, current expense[?] A. Yes, sir.

"Q. When you were building these dies, to be used for these Government contracts, they were written off on your books as a manufacturing expense, were they not? A. Yes.

*   *   *   *   *   *

"Q. But the moment the Government terminated your contract for the convenience of the Government, that became one item that the Government was going to reimburse you for, the cost of those dies? It that correct? A. Yes.

"Q. That immediately became an asset of the company, did it not? A. Well, not any more than it had been previously.

"Q. Do you mean to say, in connection with terminating these contracts, the Government was going to reimburse Algonac for the cost of these dies *   *   * that Algonac had already written off the cost of? A. Yes, sir. *   *   *

"The Court: You mean that Algonac is entitled to recover back the cost of dies they have already charged off?

"Mr. Cohen: (Counsel for appellants) No, no.

"The Court: All right.

"Mr. Cohen: It is just a method of bookkeeping. When you start, if the Court please, and the dies are going to be used for only one job, they are a cost of the job. When you tool up on a job, you tool up for the entire contract.

"The Court: All right, proceed.

"Mr. Cohen: Later on, those figures, those very figures just went into making up the cost—they don't get paid double; they just get paid once."

The government was beguiled into leaping to the conclusion that such items included in the settlement proposal in the amount of $252,355.72 were "false, fraudulent and improper in that [they were] not based on the books and accounts of the company, which show no supporting entries, but is an arbitrary unfounded figure."

Here it seems to us the government made its first mistake—in which it still continues—in its insistence that if, in a fixed price contract, items of cost do not appear on the books of the company contracting with the government, that fact is evidence of fraud if, on termination of the contracts for the convenience of the government, such items are inserted in the company's records and submitted as costs which the company is entitled to recover from the government.

In the plethora of repetition and computations extending over approximately 750 pages of the typewritten record, the trial court finally, after the proofs had

closed, and during the concluding argument of government counsel, sought, in view of the fact that Mr. Maxwell's figures were, admittedly, only estimates, to ascertain what the government was actually contending as to Maxwell's claimed fraud in submitting to the government as costs the $252,355.72 item for dies, jigs, and fixtures; the item of $35,000.00 for legal fees; and the item of $35,000.00 for the value of the die shoes taken over by the government; and the replies of government counsel, and the evidence, are convincing of the absence of culpability on the part of appellants as to the criminal charges made against them in this case.

With reference to the legal fees billed to Algonac by Mr. Bixler, an attorney, and the item of the value of the die shoes, the trial judge asked counsel for the government:

"The Court:   The existence of the items was discussed, weren't they, but not the amounts?   Isn't that it?
* * *

"Mr. Jones:   The only discussion in the record as to those items with any representative of [Detroit Ordnance District] was the testimony of Mr. Stanley, and the testimony of Mr. Maxwell, that that was discussed.

"The Court:   Mr. Stanley testified they were discussed.   * * * wasn't it Mr. Stanley who testified that Maxwell told him that he owed Bixler, and that Stanley told him to put it in [the settlement proposal]?

"Mr. Jones:   That is correct. Stanley testified that he did discuss with Mr. Maxwell the matter of an item of attorney fees.   He said he does not recall that there was any amount specified, and it was a general discussion, and that he told Mr. Maxwell if he felt that strongly about it he should put it in and if he could substantiate it, it would be audited and examined in the records.

"The Court:   Is there any testimony here that that is not a proper fee?   Not a proper charge?

"Mr. Jones:   Well, there is the testimony of Mr. Maxwell that he certainly did not recognize it as a proper charge.

"The Court:   But he is being sued; the testimony is that he is being sued for that and a lot more.

"Mr. Jones:   Yes, the Company is being sued for that and a lot more; and he has a set-off in the case too for that and a lot more.

"The Court:   Well you did not put in any proof, the Government offered no independent proof as to the validity of that fee, did you?

"Mr. Jones:   No, we offered no proof as to that.

"The Court:   What can I assume as to that?   Here you have some conversation, at least, between Maxwell and the contracting officer about the existence of the fee.   The contracting officer says, 'Well, if you feel strong enough about it, put it in.'   He does put in a fee.   Now he says that he has never recognized the validity of it, but yet he produces a bill and a letter from Bixler claiming the fee.   You offer no proof from Bixler or anyone else about that matter.   What am I to assume? In other words, the Government knew about it before it was put in, some fee, maybe not the amount, but existence of the item, at least.

"Mr. Jones:   *There was nothing on the books of the company* in any proportion.   There is nothing in the claim to show that the services of Mr. Bixler in any way related to the contract.

"The Court:   *You would not put that on the books, would you?   If you hire a lawyer, how would you find it on the books?*   You would find an account, maybe, and attorney fees.   *You would not find anything*

*on the books,* would you, as to how it is itemized?

"Mr. Jones: Well, I think you would find something in the lawyer's statement referring to what the services were, rather than just a blanket amount for so many hours' services.

"The Court: *Am I, in a criminal case, to hold a man guilty because something is not entered on his books in the right place and on the right form?* * * * If he honestly believed that somebody might collect that money from him, whether he feels he owes it or not, that is not so much the point, but *if he honestly believed somebody might collect that money from him, hasn't he got a right to put it in as part of his costs?*

"Mr. Jones: Well, I think if he honestly believed that the services were rendered in connection with the contracts in any way, and if he honestly believed that there is a possibility of the collection of that item, even though he disputes it, I do not argue that he should not put it in, *but it should be put on his books.* * * *

"The Court: Well, I am not so much concerned with the technicality or technicalities of this matter as I am the real facts. *Just because it is not on the books in the right place, and so forth, does not concern me near as much as what was the intent of the defendant,* and what the real facts are about it. After all, *you can't send a man to jail, or convict him in a criminal case just because he has some sloppy bookkeeping."*

The trial court then proceeded to attempt to ascertain what the real claims of the government were with regard to the fraud charged as to the item of the die shoes.

Amid all the discussion and testimony about the die shoes, it appears that the government officials didn't even know what die shoes were. Mr. McDermott

took the officials out to the plant and showed them the die shoes, and why they were necessary in using the dies. They were attached to the dies and held the die sections together. The company had them and required them, as part of its equipment to carry out the government contracts. Mr. Maxwell testified that the die shoes furnished to the government came from the company's plant; that a set of die shoes "like the ones we are looking at now * * * costs, per set, about $130.00"; that "the prices are set by their sizes and weights, and however heavy they must be; * * * and I explained this to the auditors."

The trial court, even at the conclusion of the case, could not understand the general accusation of the government against Mr. Maxwell, with regard to the die shoes, and, accordingly, asked for an explanation of this item from government counsel, during the closing argument:

"The Court: Well, we have discussed the fees for the attorney, the attorney fee item. Now I would like to have you discuss for me the die shoe item.

"Mr. Jones: Well, the testimony of Mr. Howell was that the die shoe item was an arbitrary amount given to him by Mr. Maxwell, and that they broke it down for this 16-month period into $2,180 and some dollars for each of the months; that there was nothing on the books to substantiate the die shoe items. It was simply an arbitrary figure added in.

"The Court: Well, let me go back to this. I am trying to get this straight in my mind. *The testimony is quite clear, isn't it, that the [Detroit Ordnance District] and the Government knew that Mr. Maxwell did not keep his books in condition to show these individual costs, for dies, die shoes, die fixtures, tools, and so forth, isn't that right?"*

This was a most important question. It seems a simple enough inquiry, and susceptible of a direct answer. But government counsel seemed to think a direct

reply would hurt his case. To the court's question, counsel replied:

"Mr. Jones: Well, you say [Detroit Ordnance District] knew it. You mean at the time?

"The Court: Yes, isn't there considerable testimony here that [Detroit Ordnance District] knew at all times here that Mr. Maxwell's books and records—

"Mr. Jones: Well, I do not think they knew it until after the termination of the contract, your Honor.

"The Court: All right.

"Mr. Jones: From then on, I will agree that they knew, or at least he represented to them that his books were inadequate as to costs, and so on.

"The Court: Yes. *Wasn't that a fact? Isn't it a fact that the books were not set up to show the cost of these die items?*

"Mr. Jones: *That is right.*"

This was finally an answer to one of the crucial questions in the case. And immediately the court proceeded to what seemed to be the inexorable conclusion:

"The Court: Well, then, how is it a false statement then to say that as to that item?

"Mr. Jones: Well, but in the statement they set it up as though it was an accurate and known amount. * * *"

This answer is without foundation, and is contrary to the undisputed testimony. They—the company and Mr. Maxwell—did not set up the die item, "as though it was an accurate and known amount." The books, as kept, admittedly did not, and could not, show such costs. Mr. Maxwell's testimony is not contradicted that he told the government officials in charge of the terminated contracts that he could not answer the questions "on the back of [the forms]," one of which, under the heading, "other costs," was for the so-called die item of $252,355.72, and his testimony was uncontradicted when he stated that he was

told to answer to the best of his ability and "there will be a conference at the termination." Moreover, Mr. Maxwell further stated, in the documents filed with the government pertaining to such claim: "This is an estimated cost on all Tools, etc., as no individual cost on each die was kept and plant rearrangement, preliminary tooling, samples, assembly tables, special trucks and etc. is all in this figure of $252,355.72." In addition, Mr. Stanley, the government official in charge, testified that everything that goes into a settlement proposal is subject to adequate substantiation, and when, after the costs, which are submitted on such proposal, are subjected to a complete audit by the Army, and items cannot be substantiated, they are set aside for consideration by the Contracting Officer and a conference is arranged for negotiation of these points. Mr. Otto, an expert contract specialist, testified for the government that disputed items in settlement proposals are "inevitably negotiated"; that the statement contained in the settlement proposal declares that it will be used directly or indirectly as a basis of settlement of a claim against the government; and he further testified that the purpose of the proposal was that the contractor furnish to the government on forms provided by it, everything he claims, and that then the government would check it; that it is understood the contractor puts in everything he thinks he is entitled to, and then the government checks the statement, and may say: "You are not entitled to your estimate"; and thereafter the contractor and the government arrange a meeting for negotiation of their differences.

To the foregoing must be added the final admission of government counsel on the argument of the case in the District Court that: "The books were not set up to show the costs of these die items."

With regard to the exact claim of fraud as to the important item of $252,355.72, the trial court was considerably confused—as would have been anyone trying to understand the contentions ad-

vanced with respect to this item; and, accordingly, the court continued in its questions to government counsel during the final argument:

"The Court: Yes. Let me ask this: Do I understand correctly now that the Government complained only of these two $35,000 items as being an improper charge to this $252,000 item?

"Mr. Jones: Well, we claim that the inclusion of those two items is an improper charge, yes.

"The Court: I say, do you contend that the item is improper, that the $252,000 item is otherwise improper, except for the two $35,000 items, that is, the attorney fees and the die shoes?

"Mr. Jones: Well, we contend that the $252,000 item is improper for two reasons: One is that the two $35,000 items were included in making up your 103.3 percent burden; and the other is that there is no basis for the hours which are included as die hours. They represented on dies, jigs and fixtures, actually what they have done is taken production time and other time in arriving at that. So that, it is our claim that the $252,000 is without foundation for that reason.

"The Court: No, but how much of this $252,000 does the Government contend was an improper charge for the cost of dies?

"Mr. Jones: Well, I do not know that I can answer your Honor in dollar amount.

"The Court: Well, how can I answer it, if you can't? I cannot speculate. There is no doubt about that. I must have the evidence, and I must not only have the evidence, but I must find from the evidence beyond a reasonable doubt.

"Mr. Jones: Well, the inclusion of the $35,000 die item increased materially the percentage of burden, by taking out that $35,000 item—

"The Court: Is that all you're claiming there for these two $35,000 items, that they inflated the burden rate?

"Mr. Jones: That is one of the results, that they did inflate it.

"The Court: Well, is there anything else? I want to know all of what you are claiming on.

"Mr. Jones: Well, I claim that that inflated the burden rate, which, of course, affected the $252,000 item; and that they have no relation to or are not based on the books, and there is no showing of any relation to the dies, or the fair value of dies or die shoes which might have been used in the $252,000 figure.

\* \* \* \* \* \*

"The Court: Well, what I am trying to find out here now is, insofar as the charges in this case, these remaining counts, whether the Government claims under any of these counts that the $252,000 item claimed was false, was a false claim made for that, for any reason other than these two $35,000 items, that is, one for the attorney fee, and one for the die shoes.

"Mr. Jones: Well, as I say, the only other reason is the fact that some $124,000 or $125,000 of that is based on so-called die hours, which could not possibly be used for it.

"The Court: Well now, where do you claim anything like that here in your indictment?

"Mr. Jones: We do not set it up in that part of the indictment, no.

"The Court: Your indictment does not cover that particular item, does it?

"Mr. Jones: No, not that specific item.

"The Court: And do you claim that these two $35,000 items affect anything except the burden rate and administrative expense?

"Mr. Jones: No."

And now comes a most analytical and perspicacious question, and a conclusive answer:

"The Court: *Does the indictment anywhere allege wrongdoing on the part of the defendants with respect to this $252,000 item, except as to the two $35,000 items? I want to get that clear in my mind.*

"Mr. Jones: *I do not believe so, your Honor, as I look at it now.*"

On another occasion, during the course of the argument of government counsel, the court again showed special concern as to the item of $252,355.72. Counsel had declared, in his argument: "Both Mr. Maxwell and Mr. McDermott were well aware that the $252,000 was an estimated item, and that it had no relation to actual costs or actual value or even fair value."

The Court thereupon inquired: "Well, there is no evidence here that it was not a fair value, is there?"

Mr. Maxwell had testified that this figure was in line with his original estimates when he put in a bid for the jobs, and that his estimate was based on his past experience. To the above question of the court, counsel answered:

"Mr. Jones: Well, the only evidence of value is Mr. Laughlin's testimony.

"The Court: Yes, but he appraised the dies. Aside from his testimony as to the value of the dies, and specifically certain dies brought into Court here, which he valued at considerably less than the amount put on the settlement proposal, that is the only evidence of value, isn't it, that the value is improper?

"Mr. Jones: Yes, that is correct."

From the evidence in the case, Mr. Laughlin's appraisal of the value of the dies is of no consequence whatever as showing fraud on Mr. Maxwell's part in setting forth the "die item" of $252,355.-72 *as his estimate.* The item of $252,-355.72 is referred to throughout the government brief as the claimed cost for dies, jigs, and fixtures. This is misleading—unintentionally so, but very misleading. The item represented much more than dies, jigs, and fixtures. It included a great deal of preproduction costs—engineering work, such as laying out and designing all tools, dies, and fixtures necessary for work; the building of these tools, dies, and fixtures, rearranging the plant, setting up paint assembly lines, the initial costs of trying out the dies, losses resulting from new production methods and building prototypes, plus a figure of 103.6% added to all of the above costs as "burden and overhead." And this was repeatedly set forth in the documents filed by Mr. Maxwell with the government. Moreover, die costs included work on dies that were discarded because they would not work. Mr. Laughlin's appraisal could not conceivably include these dies, that probably were disposed of as junk, although the expense in making them would be a proper charge against the government. As Mr. Maxwell testified: "Sometimes a die, as designed, will not work in try-out, and it requires that you go back to the beginning and start over again." Mr. Laughlin had testified that he found 125 allocable dies which he valued at $43,-322.20. These dies, after being appraised by Mr. Laughlin, were shipped to the Lima Ordnance Depot, and it was claimed by the government that these were the only dies in the possession of Algonac that were properly allocable to the contracts. Nevertheless, when some of the dies had been brought from Lima to the courtroom as exhibits on the trial, it appeared that a number of these dies were those which had been placed on Laughlin's "unallocable list"; and he could not explain how these unallocable dies had been taken by the government from the Algonac Company to the Lima Ordnance Depot. How many more dies had been taken from Algonac by the government, and what their total value was, nowhere appears. Neither Mr. Maxwell nor the company had ever been informed that the dies had been appraised at $43,-

322.20. Mr. Maxwell knew that after the termination of the contracts, a certain number of dies had been rejected as not having been used for the contracts. He had discussed this matter with Mr. Stanley, the government official in charge, and had been told: "Enter them on the proposal, and we will sit down and discuss them; * * * any costs relating to starting and anything connected with this contract, in the performance of it, the contractor is entitled to recover his money; and at this discussion we will bring these points up and discuss them in detail, but we want that put in that document." Mr. Maxwell insisted that the disputed dies had been made for the contracts in question. He claimed that they were intended for the job; and he stated that he wanted to be paid for everything that the company did that contributed toward the costs. He was never told that the government had subsequently made an estimate of the value of the dies, until he heard the testimony to that effect during the course of the trial. Mr. Maxwell still contends that many of the dies which the government representatives determined were not allocable to the contracts with Algonac, actually were so allocable. In fact, it was claimed that 201 dies were allocable to the contracts. However, the point of the foregoing is that an appraisal of 125 dies at a value of $43,322.20 is no proof whatever that the item of $252,355.72 was a fraudulent valuation of the tools, dies, jigs, and fixtures, plus the preproduction costs and expenses of preliminary engineering work for the contracts, such as laying out and designing all tools, dies, and fixtures necessary for the work, building them, rearranging the plant, setting up assembly lines, and the rest of the many items properly allocable plus the figure of 103.6% added to all of these items, as "burden and overhead."

■ The so-called "die item" was never more than an estimate by Mr. Maxwell, was not required to be more than an estimate, and was so understood by the government officials in charge of the terminated contracts. The criminal conviction based on the claimed fraud of Mr. Maxwell's estimate of the item of $252,355.72 cannot be sustained.

■ Other counts in the indictment are based upon Mr. Maxwell's allegedly false statements, as set forth in the documents of the termination claim. These statements were in the form of answers to the routine questions and requests for information set forth in the printed forms of the schedules and blanks provided by the government. The first of these items was:

"Have There Been Any Significant Deviations From Your Regular Accounting Procedures And Policies In Arriving At The Costs Set Forth In The Attached Proposal?"

to which Mr. Maxwell answered: "No," whereas the government contends he knew that the daily time cards of many employees had been fraudulently changed to show a large amount of time for die work, so as to build up and support the false claim of $252,355.72 for dies, fixtures, jigs, and special tools, and when he also knew that two $35,000 items had been arbitrarily added to expenses in order to inflate the termination claim.

As heretofore indicated, we feel there is no merit to the government's claim of fraud on the part of Mr. Maxwell in submitting to the government the so-called die items, and the expenses of die shoes and attorney fees, as costs in the termination claim. The daily time cards were never used to build up and support any false claim; and this consideration will be hereafter adverted to more fully in relation to the conspiracy claim.

■ It is further contended that, according to the indictment, Mr. Maxwell gave a false answer to the inquiry in the settlement proposal: "Furnish Policy Or Procedure For Recording and Writing Off Starting Load." Mr. Maxwell answered: "None used—our policy is to include starting load such as tooling, samples, plant rearrangement, etc., in Tool & Die Cost as shown on line 7 of Form DD–540." It is claimed by the government that this answer was false because

he "knew that Algonac had no such policy in such matters and had not followed such practice previously."

As the trial court stated to government counsel during the final argument, with regard to this answer: "Well the answer there is both ways, isn't it, when he says 'none used.' He says that in the first part there."

"Mr. Jones: Well, he said 'None used.' If he had stopped there, he might have been all right. But then he goes on to explain that he did have a policy which we say was not the policy."

This was the smallest and most technical kind of complaint about the statement, and cannot be the basis of criminal action and conviction in this case. The meaning of the statement is obvious. Mr. Maxwell said, in effect, that the company had no policy and procedure for recording and writing off the starting load; and he then stated what the company had actually done in this case. This seems clear; but if the answer could be said to be unclear or confusing, its effect could, at most, be no more than to induce a request for clarification. Certainly, it could not be considered as a false and fraudulent misrepresentation.

Finally, it is claimed that Mr. Maxwell was guilty of making a false statement in the settlement claim in his answer to the following question therein: "State Policy And Procedure For Verification And Negotiation Of Settlements With Subcontractors And Vendors." To this he answered: "Forms of subcontractors over $1,000.00 included," when, as the government claims, "he knew that the claim of subcontractor Maple Lane Die and Stamping had not been included with the other subcontractors, even though it exceeded $1,000.00 and said John A. Maxwell knew and concealed the fact the claim contained a sum of $40,740 for dies, which he had purchased on behalf of Algonac Manufacturing Company for a maximum of $15,000."

In its findings, the trial court stated: "Count 5, which is made up of several subdivisions, under paragraph 4 of that count, was also limited by agreement of the Government to the items charged under paragraph 4, excluding an item of $40,740 for dies allegedly made by the Maple Lane Die and Stamping Company." With regard to the Maple Lane matter, the court said: "I earlier struck that particular item from the case, and I have not considered it in any way whatsoever in reaching a verdict." It appeared that the court had previously dismissed subsections (b) and (c) of paragraph 4 of count 5. The court should likewise have dismissed subsection (e) of paragraph 4 of count 5, which related to Maxwell's answer to the inquiry: "State Policy And Procedure For Verification And Negotiation Of Settlements With Subcontractors And Vendors." This subsection had not been dismissed, although the court stated that the matter therein had been excluded from consideration and that it had not been considered in any way in reaching a verdict. There is no basis, therefore, for any contention on the part of the government that Mr. Maxwell is guilty of making any false statement or representation to the government with regard to the Maple Lane subcontract, as charged in subsection (e) of paragraph 4 of count 5 of the indictment.

Finally, we come to Count 9, the conspiracy count upon which appellants were convicted.

It is easy to perceive the genesis of this claimed conspiracy: A group of employees of the company were engaged, "in teams," to make entries and changes on work cards, long after the work on the contracts had been completed, in an effort to segregate the costs allocable to the different individual dies, jigs, fixtures, and the like. Government auditors at the Algonac plant first suggested this action, and said that they wanted an exact figure after each die, jig, fixture, etc., on the cards. They had numerous discussions with the plant officials as to breaking down the costs in the $252,355.72 item and placing this figure against each individual die, jig, or fix-

ture. In the course of this work of "breaking down" the costs (concerning which there was no possibility of ascertaining such figures from the books and records), and because of the frantic work of different employees in trying to "line up" the cards and inserting the word, "die," on certain work cards, the news of such efforts apparently reached "high echelon" which leaped to the conclusion that these records were being fabricated to defraud the government. To one who had not been present at the conversations between the government auditors and the officials of the company, this suspicion may well have been justified. But suspicion is not evidence; and the charge of conspiracy as alleged in the indictment failed of proof.

The claimed conspiracy to change and falsify the records is charged by the government to have been conceived by Maxwell and undertaken by him with others on or about October 1, 1953.

It is our opinion, after a painstaking review of the evidence, that no such conspiracy was proved. However, in disposing of this grave accusation, we consider it necessary to examine and discuss, in detail, the charges and evidence in relation to this conspiracy count.[2]

2. The conspiracy count alleges that: Mr. Maxwell, Mr. Howell, Mr. McDermott, and Algonac "from on or about October 1, 1953, up to and including the date of filing this indictment, * * * unlawfully, wilfully, knowingly and feloniously conspired, combined, confederated and agreed together and each with the other, * * * to commit offenses against the United States * * * by (1) unlawfully, wilfully and knowingly * * * falsifying a termination claim for cancellation of the contracts [here in question]; and (2) by knowingly and wilfully making and using false writings and documents, knowing the same to contain false, fictitious or fraudulent statements or entries in connection with the termination claim and schedules relative to said contracts * * *; and (3) by knowingly and wilfully concealing or covering up by trick, scheme or device, the material fact that the termination claim, financial statements, schedules, and supporting data for said claim and statements were in part false, fictitious and fraudulent and not in accord with the books, records and files of Algonac Manufacturing Company; and (4) by falsely setting up a claim for $252,355.72 for dies, jigs, fixtures and tools for said contracts, which was not based on the books of said Company but an arbitrary fabricated sum; and (5) by changing, destroying, altering and falsifying hundreds of daily time cards so as to falsely show the time of those employees to have been used on dies, instead of other types of work."

The indictment goes on to state:

"2. It was a part of said conspiracy that the termination claim of Algonac Manufacturing Company for cancellation of said eight contracts would be built up to approximately $500,000.00.

"3. * * * that to build up said claim all dies, jigs, fixtures and tools in and about the Algonac Company's premises would be represented as used or necessary for work under said contracts, notwithstanding that some dies were for commercial work and items not involved in said * * * contracts * * *.

"4. It was a part of said conspiracy that all steel in and about the Algonac Company's premises be offered as termination costs to build up the claim, notwithstanding the fact that much of it was useless, deteriorated and of no use for work in said cancelled contracts.

"5. * * * to build up and support the large claim for dies etc. by altering, changing and falsifying the daily time cards of many employees whose work had nothing to do with the making of dies.

"6. * * * to change the records of Algonac Manufacturing Company, particularly the time cards, without the knowledge or consent and unknown to the United States, * * *

"7. In pursuance and furtherance of, and in execution of, and for the purpose of effectuating said conspiracy, the above defendants did commit the following overt acts, * * *:

"(a) On or about October 16, 1953, John A. Maxwell advised Detroit Ordnance representatives that his company's termination claim would be about $500,000.00.

"(b) * * * advised Edward Y. Howell, 'We are going to shoot for a claim of around $500,000.' That [Mr.] Maxwell thereupon began to have a payroll analysis made up as

■ In discussing this lengthy count,[3] which covers three and one-half printed pages of the record, we are met at the outset with the fact that the conspiracy is primarily directed to the charge that the "die item" of $252,355.72 was a false and fraudulent statement of a fictitious amount submitted to the government by Mr. Maxwell in the Schedule of Accounting, Financial Balance Sheet, and Settlement Proposal. We have held that the above mentioned amount was an estimate by Mr. Maxwell and so understood by all of the government officials in charge of the terminated contracts; and that his inclusion of that item in the documents submitted to the government, specifically calling attention to the fact that the amount was an estimate, cannot sustain his conviction on the charge of his commission of a crime against the government.

The conspiracy is charged as commencing on or about October 1, 1953. There is no evidence whatever that any conspiracy commenced on or about that date. The Algonac Company received its first notice of the government's defaulting three of the eight contracts on October 2, 1953; and on October 16, 1953, it received notice of the government's defaulting the balance of five of the contracts. If these defaults had not been subsequently changed by the government to "termination for the convenience of the government," Algonac would have had no claim whatever against the government; and would have, moreover, been subject to a penalty; and there would have been no use or sense in attempting to prepare claims for a settlement based on a termination for the convenience of the government, while all the contracts were in the status of having been defaulted by the government for nonperformance.

After the first three contracts had been defaulted and just before Mr. Maxwell received notice that the last five were defaulted—on October 12, 1953—Mr. Maxwell, with Mr. Howell, went to the office of the Detroit Ordnance District and met with Mr. Asquith, the Branch Chief; Mr. Stanley, the Contracting Officer; Mr. Hodges, and Mr. Laughlin, representing the government. It is undisputed that at that time Mr. Maxwell tried to have the government consent to his completion of the contracts; but when he stated that, otherwise, his losses would approximate half a million dollars, he was told by Mr. Asquith that it would be cheaper for the government to pay him that amount rather than take a million and a quarter dollars' worth of material they did not

a base for prorating the desired amount of labor charges to the making of dies.

"(c) On or about December 1, 1953, defendants * * * set up a force of employees to change the daily time cards so as to build up a cost for dies, as requested by John A. Maxwell. Such force of employees consisted in part of [four named employees] and others."

The conspiracy count concludes that on March 31, 1954, Mr. Maxwell, on behalf of Algonac, signed and submitted a settlement proposal containing claims based on the altered, false and fraudulent records of Algonac; that on the same date, he signed and submitted a termination claim with supporting schedules which were false and based on the altered and fraudulent records of the Algonac Company, and further submitted a Schedule of Accounting Information representing that the claim of Algonac was based on proper records and accounting policies; that on February 8, 1954, Mr. Maxwell submitted a financial balance sheet of Algonac as of December 31, 1953—which balance sheet contained a false and fictitious item in the Asset column of $252,355.72 for dies, tools, jigs, etc. and which statement was not based on the true records of the company; and, finally that Mr. Maxwell directed, guided, and had full knowledge of the alteration and changes of daily time cards, and supervised the work of the others in said changing operation, and in building up the termination claim to exceed $500,000.

3. In paragraph 4 of this conspiracy count, heretofore quoted, the charge that the steel on hand in the company's plant, offered as termination costs, was useless and deteriorated, was removed from the case, by the court's action in dismissing various counts of the indictment.

need and pay freight and storage on it. However, the government officials did not tell Mr. Maxwell, at that time, whether or not the defaults would stand, or whether they would be changed to "termination for the convenience of the government"; but he was told to send a letter explaining the cause of the delays and why the material had not been delivered according to schedule, so that the government could consider whether the defaults would stand, or whether they would be changed to termination under the "convenience" clause of the contracts. It is important to note that, during this meeting, when a discussion arose as to the manner in which costs had been kept, Mr. Howell, who was in charge of Algonac's bookkeeping, explained to the government officials—on October 12, 1953—that the company did have an improvised system of job cards, but he would not guarantee it.

After this meeting between Mr. Maxwell, Mr. Howell, and the government officials, and after extensive correspondence, the government changed the defaults to "termination for the convenience of the government," by a letter to Mr. Maxwell, *dated November 25, 1953.* After receiving this notice, Mr. Maxwell testified that he had a meeting with the government officials in charge of the terminated contracts, including Mr. Moyles, acting for Mr. Stanley; Mr. Stone, of the Legal Department; Mr. Marino, of the Price Analysis Division; and Mr. McMullen, representing the Contracting Officer. At that meeting, Mr. Maxwell was given the forms relating to the termination settlement proposal—*late in November.*

About December 14, 1953, two Army auditors, Corporal Spielberg and Corporal Swanson, arrived at the Algonac plant to audit the "termination proposal."

In answer to a question by government counsel on direct examination as to whether the two auditors had seen any of the Algonac employees sorting out work or time cards while they were there, Mr. Spielberg, testifying for the government, stated:

"We asked Mr. Howell and Mr. McDermott to get us labor time tickets. If this is what you mean by sorting out, yes, we did.

"Q. Well, were they sorted out or broken down into weeks, months, days, or any particular period? A. They just brought us big boxes out, and various bundles; I guess they were by weeks and months.

"The Court: *Did they do that at your request?* A. *Yes, sir.*

"Q. Did you observe where they brought those cards from? A. I believe they brought them from upstairs, in the attic, or someplace.

"Q. How long were you there at Algonac Manufacturing Company? A. Well, we were there December 14th, and then we came back later, about the 17th, and I believe we went on Christmas leave at that time and didn't return until after New Year's.

\*      \*      \*      \*      \*      \*

"Q. Well, what directions did you give [Mr. Maxwell, Mr. Howell, and Mr. McDermott as to setting a figure for each specific item in the die schedule]? A. We told the representatives of the company to give us the exact amounts of tools, dies, jigs, and fixtures, that we could trace through their general records."

On cross-examination, Auditor Spielberg testified:

"Q. You stated that when you first came there, they brought down these time records, those time card records \* \* \*? A. Not when we first came there. After we were there the second time, I believe it was. They brought these boxes of time cards from upstairs someplace.

"Q. Now, at that time did you meet a young man by the name of LaParl, Mr. Howell's prospective son-in-law, a young chap? \* \* \*

**504**

"A. As I recall now, there was someone there that was a kin to Mr. Howell, or to one of the members of the company.

"Q. Who was helping out with those time cards, is that correct? A. Yes, I believe that is so—helping out, as far as physically bringing the cards to us.

"Q. When they brought the cards to you, then *wasn't it necessary to sort those cards out into weekly groups as to time?* * * * A. Yes. *I believe we asked them to break it down as far as weeks were concerned, particularly weeks.* I believe this young man did do this.

"Q. Because they had a sort of weekly summary sheet that they had the job charged to. * * * A. Yes, sir. * * *

"Q. Didn't [Howell] also mention the fact that a lot of people— didn't you find out in some instances that they didn't even sign any cards for the person that was supposed to be working there that week? A. This could have happened, yes.

* * * * * *

"Q. Well, do you recall, in your checking of the figures, that the $252,000 item included burden and overhead; it was not simply for tools, dies and fixtures, but it included burden and overhead, at the rate of 103.6%? A. * * * we asked what this figure represented, and they said it represented labor and overhead. Then they gave us the labor figure and 103.6%, applied to the labor figure, to come out to $252,000.

"Q. That is the point I am getting at. And isn't it a fact that when they had the $252,000 they gave you a list of the dies, they also had a list of the dies that were involved, the dies, jigs and fixtures that were involved, didn't they? A. We had a list of dies, that is right.

* * * * * *

"Q. Did you tell them that you wanted this broken down, this total figure broken down with the figure opposite each die? A. We told them we wanted the $252,000 broken down so that we could audit it.

* * * * * *

"Q. And did you ask, or did you want that to be broken down so that you would have some sum for each die, and after each fixture? A. We said that— .

"The Court: Can you answer the question?

"Q. I am trying to find out if you wanted a breakdown of the $252,000—did you want a breakdown as to each die and each fixture? A. We wanted a breakdown as to labor and overhead; anything that represented labor and overhead, we wanted further— .

"The Court: *That is not the question. He asked you two or three times, did you ask them, at Algonac, or anybody there, to break this down, to show the cost of each particular die and each particular fixture?* A. *Yes, we did, with the labor and overhead applicable to each die and fixture.*

"Q. *With the labor and overhead applicable to each die and fixture?* A. *Yes, the exact amount.*

* * * * * *

"Q. And you knew that on the labor summary sheet they had no breakdown as to individual dies, or individual fixtures or individual mechanics; you knew that, did you not? A. That is right.

* * * * * *

"Q. *You knew that, according to their system, they only charged total labor against a specific job?* A. *They charged against the job, that is right.*

"Q. And you knew that, under their system they did not keep track of the labor against individual dies, jigs or fixtures?

\* \* \* \* \* \*

"The Court: Did the books show a breakdown for each individual die or fixture or jig? A. No. We didn't have any figure for that.

\* \* \* \* \* \*

"Q. *You told them that you would like to have an individual breakdown for each die and fixture so that it would include both labor and overhead, is that correct?* A. *I believe that is so.*"

All of the foregoing is ample proof of the fact that there was no conspiracy, commencing on or about October 1, 1953, on the part of Mr. Maxwell, with others, to set up a false claim for the item of $252,355.72, by changing, altering, and falsifying hundreds of daily time cards to show the time of employees to have been used on dies, rather than on other types of work. Instead of Mr. Maxwell's conceiving the idea of falsifying the time cards to establish that the time of the employees was allocable to the "die item," it is finally disclosed by the auditors themselves that they were the ones who originally asked that the employees of the company get the big boxes and bundles of time cards from the attic of the company and sort out the cards to "break them down" into months, weeks, and days, to show the exact cost of labor and overhead applicable to each die and fixture item, although these auditors knew that the basic cost system and the books of the company showed no breakdown for each individual die or fixture; and it was conceded by all the government's witnesses that the individual costs of the dies and fixtures were never set up on the books and records of the company, and, as the government's expert witness, Larson, testified: There was no place in any of the records in the Algonac Company where they kept any real cost accounting so that they *could* tell the cost of a particular die.

Earlier in the case, during Mr. Maxwell's testimony on this crucial issue, it appears that the trial court was somewhat astonished by Mr. Maxwell's testimony:

"The Court: I understood you to say that instead of showing these intangible items separately, that the Army auditors suggested that you set them up and include it in other costs, \* \* \* and so forth, and allocate it to specific tangible items? A. That is right.

"The Court: And that the Army auditors suggested that? A. And they had full knowledge that we had no die costs.

"The Court: And you mentioned one of them was Mr. Swanson? A. That's right, Corporal Swanson and Corporal Spielberg."

Yet the above answers of Mr. Maxwell were proved to be true in the subsequent testimony of Corporal Spielberg, himself. Moreover, in a supplemental memorandum to the termination agreement, Mr. Maxwell notified the government that the two auditors had requested "that it would be necessary for the Algonac Manufacturing Company to put some figure opposite each die." This memorandum was served on the government on August 3, 1954. On the trial, the government replied that this memorandum was vitiated by the fact that it was made after the grand jury subpoena had been served. But the facts stated in the memorandum to the effect that the auditors had asked them to put a figure after each individual die, were proved by the testimony of the auditor, Spielberg. Moreover, it was testified, without contradiction, by Mr. Maxwell that the original or changed cards had never been used by the company to establish or justify its claim, and neither the auditors nor any other government officials ever used them for any purpose.

There is much contradictory testimony as to how the item of $252,355.72 was obtained. Mr. Howell, testifying for the government, said it came from Mr. Maxwell; and Mr. Maxwell said it came from Mr. Howell. Why the time cards were sorted and changed was also the subject of much confusing and contradictory testimony. But in none of the evidence is there support for the charge that on or

about October 1, 1953, Mr. Maxwell entered a conspiracy to falsify the termination agreement by fraudulently changing hundreds of time cards. The idea of using the time cards, sorting them out, as to weeks, and placing a figure after each item of dies and fixtures, originated with the auditors.

With regard to the so-called card-changing project, the trial court, at first, seemed to agree with appellants' contentions in this respect. The court, in its verdict and findings, stated:

"It seems that on the first occasion the cards were brought down, of which there were many thousands, brought down, from the place where they were filed, in the attic or some place in the plant, brought down to the office or in back of the office, and they were there separated and placed in piles, and that they were arranged by weeks, months and years, and that the work cards were checked against the time clock cards,—first of all, to have the work cards agree with the time clock cards as to the total number of hours, and also make them agree with the payroll summary sheets as to the total number of hours. Apparently, on a later occasion, before or after or around Christmas, 1953, a crew was put to work changing these cards. The cards were changed, many, many cards running into the hundreds, perhaps thousands, changing the job numbers and the work performed. In each instance, the work performed was changed to read 'dies' from some other type of work, and job numbers were changed to reflect a job number under some one of these eight contracts."

Mr. Howell, who, perhaps unwittingly, pleaded guilty to the fraud claimed by the government, and who was a witness for the government against Mr. Maxwell, testified that the government auditors wanted a "break down" of the work cards as to the cost of each item; and he further testified that "the auditors wanted a figure after each particular item." This was exactly what Mr. Maxwell maintained. *The first persons to mention such a "break down" and to request that it show the cost of each particular die and item were the government auditors, although they knew that the company had no system for such cost accounting.*

Mr. LaParl, who was the son-in-law of Mr. Howell, and who originally handled the great mass of cards and was in charge of the changes on them, was, as above mentioned, a witness for the government, and he told how during the latter part of December, 1953, he got the cards out of the attic of the company's plant, and set them out in order as to days, weeks, and months. He was asked by government counsel as to whether he made any notations on the time cards and replied that he did not, but "put that particular contract number with cards aside so that we would know that we had the correct number of hours on it," whereupon the trial court remarked: "That is just as clear as mud to me." Mr. LaParl, however, went on to testify:

"After returning to work for the company about the middle of December, the first job was to bring cards down from upstairs and they were put away in the filing cabinet. I brought those down and then I was to break down cards to day, week, month for the period of the terminated contract. We first broke the cards into a group for job numbers that it happened to be that they happened to work on. Then I had to put those into times, as to day, weeks and months. So that, for example, for August, I would have four piles of cards with rubber bands around them with the weeks in that particular month, and was for all of the contracts as they divided up. I had, for example, on this particular distribution sheet that I had for the first contract, the number 2094; those cards would be on top. Then they would be divided into the days. After we had the division for that

particular month we would take the distribution sheet and check across the top for the weeks, the number of hours, and show it across the top of the white sheet."

This testimony, adduced on behalf of the government, appears definitely to confirm appellants' theory that the project of changing the work cards was originally conceived with the purpose in mind of reconciling the work cards with the payroll analysis sheets, and with the payroll.

It is to be noted that this was the commencement of the project as to the work cards. The government claimed that the so-called work card project started during the latter part of October, 1953; but the cards were never thought of until the government auditors requested them to be brought down from the attic of the plant in the middle of December, 1953. The evidence indicates that the changes made by Mr. LaParl were in keeping with the request of the government auditors who directed that there be an individual break down of costs for each die and fixture, as testified to by Auditor Spielberg; and it is proof that the cards were not changed by the order of Mr. Maxwell to show fraudulent and fictitious items of expense to be charged against the government. The cogent fact is that the foregoing is disclosed by the testimony of Mr. LaParl, upon whom the government relies as one of its important witnesses to show that the inception of the work-card project was conceived by Mr. Maxwell in order to defraud the government.

We cannot conclude from the evidence in this case that Mr. Maxwell was guilty of any conspiracy. But if any conspiracy on his part, after the latter part of December, 1953, could be implied, with regard to the so-called "card changing," after the suggestions which had been made by the auditors, it is not the conspiracy charged in this case.

█ A defendant in a criminal case is entitled to know what he is charged with; and he is entitled to be tried on the charges brought against him. Ep-

stein v. United States, 6 Cir., 174 F.2d 754; Bratton v. United States, 10 Cir., 73 F.2d 795; United States v. Wills, 3 Cir., 36 F.2d 855.

Mr. Maxwell has not been charged with a conspiracy to deceive the auditors during the last half of December, 1953. Neither he nor any of the other defendants used the cards or caused them to be used by the government, to establish or justify the claim of $252,355.72. The claim for this amount was made before any cards had been brought down from the attic of the company, at a time when the company had first filed a claim for partial payment, and had received $200,-000 thereon from the government in the early part of December, 1953. The government has never questioned the validity of the payment made on such claim. Mr. Maxwell was entitled to be tried on the charges of conspiracy brought against him; and there was no proof to support such charges of conspiracy.

Mr. Maxwell is charged, "in furtherance of, and in execution of, and for the purpose of effectuating such conspiracy," of committing the following overt acts: advising the Detroit Ordnance representatives that the company's termination claim would be about $500,-000; and advising Mr. Howell: "We are shooting for a claim of around $500,-000." He denied the latter statement; but it is of no account, in any event. It is admitted that the current liabilities of Maxwell's company at the time of termination of the contracts were $450,-000. He was entitled to 10% profit on the terminated contracts, which brings the figure to $495,000. Mr. Maxwell's present claim is that the government now owes Algonac $318,180.57. No one so far, has questioned or contradicted that this amount is due to Algonac. The government simply refuses to discuss it on orders from "higher echelon." From the foregoing, we find no overt acts in proof of the claimed conspiracy.

In its decision and verdict, the District Court states that the government claims the costs set forth in the expenses for the "tool and die" item were exces-

sive. However, it appears that the government does not claim in the indictment that such costs were excessive. The indictment charges that the costs were not taken from the books of the company and were fictitious, in the sense that the amount claimed was arbitrary; but there is no proof or contention that they were excessive.

There are certain misconceptions in the verdict. The court recited that "it is also ridiculous in the mind of the Court, that Mr. Maxwell did not know that these cards were being changed or why they were being changed." Mr. Maxwell's own testimony, many times repeated, without hesitation or qualification, is that he *did* know the cards were being changed and he explained, as far as was possible, why Mr. LaParl and others were engaged in making the changes, all of which was consonant with Mr. LaParl's testimony and in keeping with the directions of the government auditors—with the exception that Auditor Spielberg, under questioning by the court, testified that he wanted figures, in this regard, that could be substantiated by the books of the company—which, as far as costs of individual items were concerned, was admitted by everyone to be impossible of ascertainment without a different kind of cost accounting system.

Another misconception in the verdict bears upon the importance attached to an item of $4,130.00, which the court, in its verdict, stated had been made a part of "item 7," which item consisted of the dies, jigs, fixtures, special tools, and preproduction costs. This amount of $4,130.00 had never been mentioned or testified to during the trial of the case. Government counsel say the court's inclusion of this matter was "so negligible as to be worthless, and it is apparent that in no manner did it control the court's final decision." But the court definitely discussed and considered the item, declaring that it was made up of "four and one-half pages of items" and further stated that the company "did not transpose it to the proper entry."

It further appears to us that the trial court, with much less time at its disposal than this court has had for the resolution of the many complicated problems of this extensive controversy, may have overlooked an important element in the case—the method by which the costs for the individual items could have been arrived at—in spite of the fact that the company admittedly had no cost accounting system by which such individual costs could have been ascertained. In this regard, the trial court stated in its decision and verdict:

"It seems to the Court too that if there were preproduction costs in addition to the dies, that there could be a reasonable determination of those items from the books and records. After all, there was available these daily time work cards, and these time work cards contained job numbers and type of work. There were also available weekly summary payroll records. * * * I see no reason why, if the daily time report cards had been taken, and the job numbers analyzed, and the type of work analyzed, that a fairly reasonable basis might not have been presented for claiming the amount for dies."

The foregoing view of the trial court was encouraged by government counsel who, in their brief in this court, declared:

"The [trial] court does not err in stating that the tool and die and preproduction costs could have been ascertained. * * * From the available data a reasonable basis could have been developed."

To these observations of the trial court and government counsel that a basis could be found from the books and records of the company to show the costs of the individual dies, jigs, fixtures, tools, and preproduction costs, we have only to observe that the testimony of all the witnesses on the subject—government experts as well as defendants—is to the contrary. Questions suggest

themselves: How could such costs be ascertained, when no records were ever kept that would enable anyone to compute them? What method could be used? These questions seem incapable of answer, for the reason that, as far as the copious and undisputed testimony goes, there was no method that could be availed of to ascertain such costs from any records kept by the company.

According to Mr. LaParl, the son-in-law of Mr. Howell, and a witness for the government, there was the same supposition on his part, as that suggested above, by the trial court and government counsel, that seems to have led to the "mess," described by one of the witnesses, of the card-grouping and card-changing project, which, it is again to be emphasized, was abandoned without being used to establish or justify costs, and without being submitted in any way to the government.

Government counsel argued that even if the figures in question were estimates of Maxwell, "the estimates had to be based on fact, not fiction, and on some records or base." In the same connection, the trial court stated that "if Mr. Maxwell and the Algonac Manufacturing Company lacked the specific data with which to justify a cost basis for these items, then it was incumbent upon them to say so, and not manufacture the data out of thin air." We have dealt repeatedly with this question.

As to estimates for each contract, Mr. Maxwell testified that he bid on about thirty million dollars' worth of material each year for different government agencies, and had no file space left to keep records on all such bids; that when he sent the bids in for the contracts here in question, he had a pretty good idea of the changes necessary to be made in the plant; that they had to relocate their conveyors; relocate the presses in order that the material would pass by the welding equipment for the "bench contract"; that it was necessary to relocate the welding equipment, placing it alongside the paint-conveyor line, all of which entailed a lot of work, and required

several weeks, "getting the sewers and everything else in there."

The figures used for the die item, according to Mr. Maxwell, appeared to him to be a reasonable amount for the tools, dies, fixtures, initial costs, and the like, "because it was pretty much in line with what we had in the original estimate; that is, the original estimate when we had bid on these jobs; and on each individual job we set up a percentage, based on our past experience of so much money to put in and used for the purpose of preparing into production, and it was in line with that figure * * * It sounded reasonable to me, based on my original estimates at the beginning of the job, and the fact that of the amount of money that was consumed as we went along. * * * It was reasonable to me, because in the original preparation, in the initial preparation of this thing, myself and Mr. Pickett had a dispute * * *. He anticipated it would be between $300,000 and $500,000 [instead of $252,355.72]."

Finally, it is sufficient to say that it is undisputed that Mr. Maxwell told the government officials, at the beginning of the controversy, that he lacked the specific data with which to justify a cost basis for these items; that he could not answer the questions as to costs of "tool and die" items; that the figure submitted by him was only an estimate; that the books were not set up to show such cost items, and that such costs could not be ascertained from the books and records, a conclusion in which all the government witnesses concurred. Moreover, it was understood by Mr. Maxwell and by the government officials in charge that in case of any question as to the items of costs, there would be a conference at which some compromise or conclusion could be reached.

One more item of harmful implication to appellants should be mentioned. In the so-called card changes, the names of two workmen were included by Mr. La-Parl and the clerks assisting him, as having done work on the dies. These two names were of men who did not

work at the company, but had been employed by Mr. Maxwell to do building work on his home. He testified they were paid by check on the company, because he derived some casualty insurance benefit therefrom; and he stated that he directed Mr. Howell to have these particular expenses charged to his personal account. Mr. Maxwell, in reality, was the owner of the company. He had nothing to do with placing the names of these two men on the cards or records, as indicating that they had worked on the dies. That was done by Mr. LaParl or other employees of the company, who were attempting to ascertain die costs from the labor cards and wage records; and there is no claim that such employees did not act, at all times, in good faith. It was one instance of many mistakes which were made in trying to reconstruct expense items from names of workmen, work cards, and payroll records, after the event. But nowhere does it appear that Mr. Maxwell caused names of these men to be placed on records showing that they worked on the dies; nowhere does it appear that the wages of these two men were not ordered by him to be charged to him personally; and nowhere does it appear that these cards, or any other cards, were ever used by the company to establish or justify its claim against the government, or were ever submitted or tendered to the government for that purpose.

■■■ We are of the opinion that the verdict and judgment are not sustained by the evidence. Even though it might be conceived that technically there was evidence to support the finding of guilt, we are of the view that the judgment cannot stand. We have carefully, and in detail, considered the entire evidence in the case, and have come to the conclusion that the conviction of Mr. Maxwell for a criminal fraud against the government, as set forth in the indictment, was based upon a mistake for the many reasons heretofore set forth; and that the verdict and findings were clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court * * * is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

It would have been well if "higher echelon" had waited a little before foreclosing negotiations between the government officials in charge and Mr. Maxwell for a settlement of Algonac's claim. Mr. Otto, the government official, testified that there had never been any negotiation on the claim of $318,180.57 which Mr. Maxwell contends the government still owes to his company. Our determination, presumably, leaves the controversy just as it was when "higher echelon" intervened—subject to negotiation between the proper government officials and Mr. Maxwell, as representing the Algonac Company. In our opinion, Mr. Maxwell was not only not guilty of any crime; he was not guilty of any misconduct.

This case required two months of trial before the District Court, sitting without a jury. Three full days were given to arguments of counsel on a motion for a directed verdict. The trial court, at the conclusion of its decision and verdict, stated:

"The case has been well tried in presenting testimony of this character, involving a considerable amount of documentary proof. It required a great deal of preparation, patience and time on the part of the government. They are to be commended. On the other hand, the defendants have been well represented. I have never seen a case better tried than was tried by Mr. Cohen in this case on the part of the defendants. He has presented the testimony on behalf of his clients most thoroughly; he has raised every possible defense that he could conceive might be raised, and has done it in a very fair and ethical manner. Nothing has been left undone, so far as I could see, by him."

Likewise it can be said that the case has had the fullest presentation on appeal. Government counsel are to be commended, as in the District Court, on their conduct of the case. We also echo the sentiment of the District Court with regard to counsel for appellants, Mr. William Cohen. It is largely due to his tireless and unremitting effort, his able marshaling of complicated facts, as well as the clarity of his presentation, that this court, in the face of a massive record of computations and bookkeeping and accounting problems, has been enabled to arrive at a proper and just determination.

In the trial of the case, the District Judge, throughout the complex and difficult controversy, displayed unusual qualities of patience and fairness, as well as consideration for the arguments advanced on behalf of appellants, and solicitude for their rights. That we find error, carries with it no reflection whatever upon the recognized judicial ability, legal skill, or sense of justice of the trial tribunal.

The judgment of conviction is reversed, the fines are set aside and cancelled, and appellant Maxwell is discharged.