**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James T. WHITE, Jr., Arthur L. Boschen, New World Construction Company, Phillip W. Akwa, and Capital Communication Corporation, Defendants-Appellants.**

No. 83–3109.

United States Court of Appeals, Eleventh Circuit.

July 22, 1985.

**1470**

Andrew A. Graham, Melbourne, Fla., for J. White.

Martin R. Baach, Carl S. Kravitz, David N. Webster, Washington, D.C., for P. Akwa and Capital Communication Corp.

John E. Evans, James E. Nesland, Denver, Colo., for A. Boschen and New World Const. Co.

Ann Arbor, Crim. Div., Fraud Section, Francis J. Martin, Crim. Div., Appellate Sec., U.S. Dept. of Justice, Sara Criscitelli, Washington, D.C., for plaintiff-appellee.

Before HATCHETT and CLARK, Circuit Judges, and STAFFORD *, District Judge.

CLARK, Circuit Judge:

On January 27, 1982, Phillip W. Akwa, Arthur L. Boschen, James T. White, Capital Communications Corporation (Capital), and New World Construction Company (New World) were indicted on 20 counts of having submitted false statements and claims to the National Aeronautics and Space Administration (NASA) in violation of 18 U.S.C. §§ 1001 and 287, and having conspired to submit the false statements and claims to defraud NASA in violation of 18 U.S.C. § 371.[1] These alleged unlawful activities stemmed from four construction contracts awarded to Mayfair Construction Company (Mayfair) at the Kennedy Space Center (KSC). The four contracts were to build the Vehicle Assembly Building (VAB), the Orbiter Processing Facility (OPF), the Fluid Test Complex (FTC), and the Mobile Launch Platform (MLP) for the space shuttle program.

Prior to trial, the defendants filed motions to dismiss the conspiracy count for duplicity. After holding hearings, the district court found that the conspiracy count alleged two conspiracies, one involving all four contracts and one involving only the contracts for the OPF and MLP. The district court cured this defect by limiting proof on the conspiracy count to the purported conspiracy involving the OPF and MLP contracts, and severing for a separate trial the substantive counts arising from the other two contracts. The indictment was redacted to reflect this decision.

Trial on the redacted ten-count indictment began on November 15, 1982. After a trial at which 28 witnesses were called and thousands of pages of documents were admitted into evidence, the jury found all defendants except Mr. White, guilty as charged. Appellants Akwa and Boschen were convicted of conspiracy to file false statements, to make false claims, and to defraud the United States, all in violation of 18 U.S.C. § 371.[2] Akwa and Capital were also convicted on eight counts of filing false statements in violation of 18 U.S.C. § 1001,[3] and one count of making a

---

* Honorable William H. Stafford, Chief U.S. District Judge for the Northern District of Florida, sitting by designation.

1. Akwa was the sole stockholder of Capital and for purposes of this appeal Akwa and Capital are treated as one. Boschen was president of New World and for purposes of this appeal they are treated as one.

2. Section 371 provides in relevant part:

   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. Section 1001 provides:

   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain

false claim in violation of 18 U.S.C. § 287.[4] Boschen and New World were convicted on seven counts of filing false statements in violation of 18 U.S.C. § 1001. Mr. White was convicted on two § 1001 counts. The district court dismissed the third § 1001 count against him and the jury acquitted him on the conspiracy charge. Mr. Akwa and Mr. Boschen were each sentenced to three years in prison; Mr. White was sentenced to three years probation; Capital was fined $90,000; and New World was fined $70,000. This appeal ensued.

On appeal the defendants contend that their submissions to NASA for reimbursement on change order work were merely estimates presented to the government as an opening position in the process of negotiating the amount to be paid, and could not as a matter of *law:* (a) constitute a false statement in violation of 18 U.S.C. § 1001, or (b) constitute a false claim in violation of 18 U.S.C. § 287. The defendants also contest the sufficiency of the evidence to make out violations of 18 U.S.C. §§ 1001, 287, and 371.

### Facts

In the early 1970's, NASA began preparing the KSC for the space shuttle program. NASA contracted with private companies to construct new facilities and to convert facilities previously used for the Apollo program to accommodate the space shuttle.

Mr. Akwa is a general contractor who was involved in the early construction work for the original space programs at the KSC. In 1974, Mayfair, through its president, Paul Cocose, contacted Mr. Akwa about the possibility of establishing a relationship for the purpose of bidding on NASA construction projects for the space shuttle. Mayfair was attracted to Mr. Akwa because he was experienced with the KSC and was familiar with available subcontractors. Mr. Akwa was interested in

an arrangement with Mayfair because Mayfair had the financial capability to handle major construction projects at the KSC.

Mayfair entered into several subcontracts and joint venture agreements with Mr. Akwa and Capital for the purpose of bidding on and performing contracts at the KSC. In essence, these agreements provided that Mr. Akwa would have authority, subject to limited review, to bid and perform on behalf of Mayfair specified construction projects at the KSC and would share in the profit or loss of any such project. Through Mr. Akwa, Mayfair bid on and was awarded four contracts at the KSC: the VAB, the FTC, the OPF and the MLP, all of which were fixed-price contracts with NASA.

Before submitting Mayfair's bid to NASA, Akwa accepted subcontracting bids from various concerns, including appellant New World, of which appellant Boschen was president. New World's original low bid assumed that it would perform the steel erection and related tasks, and that another subcontractor would provide the fabricated steel. Industrial Steel Corporation, a fabricated steel concern, was also low bidder to supply aluminum and steel for the construction.

After Mayfair's bid was accepted by NASA, Akwa set up a different arrangement with his subcontractors. Where Industrial and New World had each anticipated that it would be first tier subcontractors under Mayfair, Akwa modified that to make Industrial a second tier subcontractor under New World; as a result, New World was financially responsible for both its own and Industrial's cost overruns. New World's original subcontract bid did not anticipate the added cost and responsibility for overseeing Industrial, nor did it anticipate the added risk of being responsible for the overruns. However, the bookeeper

---

any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**4.** Section 287 provides:

Whoever makes or presents to any person or officer in the civil, military, or naval ser-

vice of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

for New World testified that Mr. Boschen had chosen the two projects because he anticipated a lot of change orders on the job and hoped that it would make New World financially sound.

The OPF and MLP contracts were "fixed price contracts," meaning that the government and lowest acceptable bidder agree that the low bidder will perform the contracted work for a stated price. Under such contracts, if the final total costs of the agreed upon services exceed the contracted price, the contractor takes the loss, conversely, he can profit if the costs are lower than the contract price. Because of the fixed price nature of the contract the contractor does not have to demonstrate his actual costs to the government, and the government consequently imposes no recordkeeping requirements under the contract. If any part of the project must be altered (pursuant to a government-issued "change order"), unless the new work is either attributable to the contractor's error or reasonably contemplated by the contract, the contractor is compensated for the additional costs under an "equitable adjustment" to the original fixed price award.

The equitable adjustment for costs of a change order may occur either before or after the work is completed. As a matter of policy, NASA strongly prefers to resolve the question of cost before the work is completed. Prior resolution protects the government by putting the risk of loss on the contractor, thereby enabling the government to budget its resources; and where the change is optional, it allows the government to evaluate the desirability of the proposed change.

In some instances, as in this case, the changes are so urgent that the government allows the change work to go forward prior to resolving the question of cost. In both resolution methods the weight of the testimony indicated that settlement of change work costs is principally a matter of negotiation.

### False Statements and Claims: The Legal Standard Under 18 U.S.C. §§ 1001 and 287

Section 1001 makes it unlawful "in any matter within the jurisdiction of any department or agency of the United States [to] knowingly and willfully make [ ] any false, fictitious or fraudulent statements or representations ..." Section 287, the false claim statute upon which count 9 against Akwa and Capital rests, provides that it is a crime to make or present to any department or agency of the United States "any claim upon or against ... any department or agency ... knowing such claim to be false, fictitious or fraudulent." Unlike § 1001, however, it omits willfulness as an element of the offense. *United States v. Cook,* 586 F.2d 572 (5th Cir.1978) *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979).

■ While a statement under § 1001 must have been made with an intent to deceive, or designed to induce belief in the falsity, it does not require an intent to defraud—which is defined as "the intent to deprive someone of something by means of deceit." *United States v. Lichenstein,* 610 F.2d 1272, 1277 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). *See United States v. Godwin,* 566 F.2d 975, 976 (5th Cir.1978).[5] On the other hand, though materiality is not an explicit requirement under the second part of the statute covering false statements, the requirement of materiality has been read into the statute in order to exclude trivial falsifications from its coverage. *See United States v. Lopez,* 728 F.2d 1359, 1362 (11th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984).

■ As we said in *United States v. Lichenstein,* 610 F.2d at 1278, section 1001 prohibits a false statement:

that is *capable* of affecting or influencing the exercise of a government function. *United States v. Goldfine,* 538 F.2d 815, 820 (9th Cir.1976); *United*

---

**5.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

*States v. McGough,* 510 F.2d 598, 602 (5th Cir.1975). that, as here, the government is not actually influenced by the statement is immaterial. *Goldfine,* 538 F.2d at 820–21. *Accord, [United States v.] Beer,* 518 F.2d [168] at 172 [(5th Cir.1975)] (dictum). The potential effect on the Government need not involve pecuniary loss. *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518 [522], 85 L.Ed. 598 (1941); *United States v. Krause,* 507 F.2d 113, 117 (5th Cir.1975). The false statement must simply have the capacity to impair or pervert the functioning of a governmental agency. *Krause,* 507 F.2d at 117–18; *United States v. Lambert,* 501 F.2d 943, 946 (5th Cir.1974) (en banc).

Finally, in considering materiality this court undertakes a plenary review, for materiality is a question of law. *United States v. Krause,* 507 F.2d at 118.

With these standards in mind we now turn to the government's evidence in this case. In reviewing challenges to the sufficiency of the evidence we view the evidence in the light most favorable to the government, drawing all proper inferences therefrom. *See, e.g. Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

6. The purpose of these direct labor provisions in a contract is to eliminate conversion of the prime contractor into a mere broker of subcontracting services.

7. The appellants contest the applicability of this evidence by asserting that it has nothing to do with the eight allegedly false estimates charged by the government. However, we find the above to be probative evidence on both the conspiracy charge (Count 1) and the false statement charges (Counts 2, 3, 4, 5, 6, 7, 8, 10). Paragraph 19 of Count 1 reads:

It was a further part of the conspiracy that the defendants, and others, would cause agreements to be executed between and among Mayfair and New World on contracts NAS 10–9025 (OPF) and NAS 10–9116 (MLP) whereby New World was to act as a subcontractor to Mayfair, and additionally, New World would maintain and monitor a work force of ironworkers, supervisors, and support personnel in the field that were paid by

*The Government's Evidence*

The OPF contract required Mayfair as the prime contractor to perform 20 percent of the actual labor; under the MLP contract the percentage of direct labor was to be 30 percent. Mayfair represented in both contracts that it would perform the direct labor involved in erecting the steel, which if performed by Mayfair would have met the direct labor requirements under the contract.[6] In reality Mayfair executed a separate subcontract agreement with New World which required that entity to perform the steel erection. Additionally, Mayfair represented to NASA that New World would be providing the steel fabrication, which in fact was contracted to be provided by Industrial.[7]

Once work began on the OPF and MLP, NASA found it necessary to issue a number of change orders; a total of over 500 before the two projects were completed. It is the appellants' claims for equitable adjustment pursuant to these change orders that constituted the bulk of the government's evidence at trial. The claims for equitable adjustment submitted by Mayfair were described in their cover letters as "cost proposals." The documents supporting these claims, which contained "Detailed Cost Breakdowns," were entitled "Estimate Summary For Change Orders." The "Detailed Cost Breakdowns" specified the number of labor hours devoted to each change order[8] and the additional charges for equipment and rental expenses.

checks drawn on Mayfair, but providing for those expenditures by Mayfair to be charged back to New World on the total subcontract costs.

All of the false statement counts read in relevant part:

[Defendants] did knowingly and willfully make and use and cause to be made and used false writings and documents then knowing the same to contain false, fictitious and fraudulent material statements and entries, to wit: on or about said date the defendants did knowingly and willfully prepare, execute and submit and cause to be prepared, executed and submitted to NASA ... a proposal including costs for New World Construction Company, presented as direct costs of Mayfair Construction Company...."

8. The typical cost breakdown for labor divided the hours among: Ironworker—General Foreman; Ironworker Foreman; Ironworker; Crane Operator; and Laborer.

The government's evidence showed that Boschen and Akwa represented at negotiations that the itemized expenses were not estimates but "hard dollar hours" and actual costs.[9] Each cost breakdown contained a "Field Support" category, which was uniformly billed at 20 percent of the direct labor cost. The evidence showed that these field support charges were intended surreptitiously by appellants to cover New World's overhead and profit. This false entry, which was listed as a cost of Mayfair, was necessitated by the form of the cost proposals submitted to NASA which represented that Mayfair, not New World, was providing the direct labor. The procedure was that New World would submit its change order draft to Mayfair. Akwa then adopted New World's labor and equipment changes, deleted New World's overhead and profit costs, and substituted markups of approximately 30 percent for Mayfair's overhead and profit, then added a 20 percent field support charge. Akwa then submitted the rewritten proposal, under which Mayfair sought to be reimbursed for the overhead and profit on what was actually New World's expenses for direct labor and materials. Because New World was represented to NASA as merely the overseer of Industrial's fabrication work, the proposals excluded any entry for New World for its direct labor expenses.[10] NASA disallowed Mayfair's field support charge because the explanation given by Mayfair indicated that it represented either excessive additional markup for overseeing Industrial or it duplicated Mayfair's own overhead, equipment, and profit charges. In essence, Mayfair sought to collect double overhead by adding in a field support charge to cover New World's overhead for direct labor which was falsely being attributed to Mayfair.

The appellants argue without support that the government has improperly raised the issue of the 20 percent field support charge on appeal, claiming that charge had nothing to do with the eight allegedly false estimates. This allegation does not withstand scrutiny; for instance, Count 2 reads in relevant part:

> [D]efendants did knowingly and willfully prepare, execute and submit and cause to be prepared, executed and submitted to NASA under change order DC–152 for contract NAS 10–9025, a proposal including costs for New World Construction Company, presented as direct costs of Mayfair Construction Company, of $23,807.87, whereas, in truth and fact, as the defendants then knew, the total costs for New World Construction Company and Mayfair Construction Company were overstated and inflated, all in violation of Title 18, United States Code, Section 1001.

Of the $23,807.87 alleged to have been falsely submitted, $1,852.66 of that amount was listed as a field support charge by Mayfair. Consequently, evidence as to the falsity of that submission is properly before this court.

### The Particular Substantive Counts

The government's false statement charges are based on cost estimates submitted in connection with seven change orders on the OPF and MLP, and on an eighth cost estimate submitted in connection with an impact claim on the MLP.

---

9. Government change orders were identified by the prefix "DC." Counts 2, 3, and 4 encompassed DC 152, 182, and 191 respectively. Ollie McCurry was the NASA contracting officer who negotiated these changes with Mayfair. According to Mr. McCurry these changes were negotiated simultaneously or within the same time frame. Mr. Akwa represented that the costs on all three proposals represented actual costs. (Tr.T. Vol. 8, pp. 2035, 2047, 2068). Mr. Boschen represented that the hours listed in DC 152 were actual hours. (Tr.T. Vol. 8, p. 2046).

Count 8 involved DC 202, on which Mr. Akwa represented that the hours listed were actual hours. (Tr.T. Vol. 8, p. 2080).

10. Implicit in the government's case, and established by the form of the cost proposal submittals by Mayfair, was the fact that Mayfair was serving as a broker for subcontractors in violation of the requirement under its contracts with NASA that it provide a specified percentage of the direct labor.

The cost estimates submitted to NASA for the seven change orders were for: relocation of the gear box on the rear swing platform of the OPF (DC 152) (Count 2); structural beef-up of the rear swing platform on the OPF (DC 182) (Count 3); wave guide penetrations on the OPF (DC 191) (Count 4); accommodation of warpage on sides one and four of the MLP (DC 48) (Count 5); accommodation of warpage on side two of the MLP (DC 130) (Count 6); refitting and repair of the treadle plates on the OPF (DC 207) (Count 7); and repair of the actuator seals on the OPF (DC 202) (Count 8). The impact claim was designated as DC 390 (Count 10). Count 9 is based upon the submission of an incremental payment voucher by the appellants seeking payment on a supplemental agreement involving DC 152 and DC 182 (Counts 2 and 3). This Count was based on 18 U.S.C. § 287 and depends upon a finding of § 1001 liability under Counts 2 and 3.

### Government Evidence of Overinflated Labor and Equipment Charges

DC 152 and DC 182 (Counts 2 and 3):

These two change orders involved work on the OPF, a structure in which the space shuttle is cleaned and its radio equipment calibrated after it returns from a space flight. Work began on the OPF in January and was substantially completed by December, 1977. The two cost proposals submitted involved change work on the rear swing platforms of the OPF. The platforms were two high towers designed to swing open, admit the shuttle into the building, and close up around it. In August, 1977 it became apparent that the gear box needed to be relocated; in late September, after the change work was completed on the gear box, Mayfair began to correct another defect in the drive assembly, which was completed by mid-November. On January 20, 1978, appellants submitted retrospective cost proposals on the two changes.

Appellants' claim on the gear box repair (Count 2) indicated an expenditure of 887 labor hours, and the detailed cost breakdown on the drive assembly repair (Count 3) claimed 3,373 hours. According to Mayfair's Job Superintendent, Red Walling,

these claims were excessive. (Tr.T. Vol. 3, pp. 828–29, 839). Mayfair and New World timecards showed that, at most, the gear box repairs took 470 hours, not 887 as claimed by appellants. (Tr.T. Vol. 6, pp. 1536–40), and at most the drive repair took 2,373 hours, not 3,373 as appellants claimed. (Tr.T. Vol. 6, p. 1562).

As to equipment charges, the two detailed cost statements together claimed that a pickup truck was used for 675 hours. The job superintendent testified that he had no pickup truck on the site. A total of 540 hours for use of the crane and wages to the crane operator was charged for the two repairs. The certified payroll showed that the crane operator worked only 395 hours during the entire period of the change work, and the job superintendent testified that the crane was rarely used on these particular change order jobs.

DC 191 (Count 4):

DC 191 involved wave guides which enclose radio cables. During construction on the OPF it was discovered that passage of these cables was obstructed by a platform and a beam, requiring two holes to be cut. The first hole was cut in one day, on August 27, and the second hole was cut between October 2 and 4, 1977. About three months later, on January 30, 1978, appellants submitted a retrospective cost statement drafted by Boschen for the work, claiming 610 labor hours. The evidence showed that claim to be excessive (Tr.T. Vol. 8, p. 859, Tr.T. Vol. 6, p. 1576, Tr.T. Vol 13, pp. 3182–83); moreover, the equipment charges listed were significantly inflated (Tr.T. Vol. 8, pp. 859–60, Tr.T. Vol. 13, pp. 3182–83).

After this cost proposal was submitted, NASA told Mayfair Project Engineer Nicholas Mattioli that the costs were inflated. Mattioli passed NASA's objections along to Boschen, stating that the submission was about "ten times" what the change involved. Boschen then prepared a new detailed cost breakdown which Akwa copied and submitted to NASA on March 20, 1978. Akwa offered and then was asked to produce time logs to substantiate the overall

claim but did not do so. (Tr.T. Vol. 8, p. 2071). Where the original submission requested almost $19,000, the second request asked for approximately $8,000.[11]

DC 207 (Count 7):

This change order involved treadle plates and the cost proposal was prepared and submitted to Mayfair by Boschen. Treadle plates are located on panels that, when lowered, provide a surface upon which workers stand when repairing the shuttle. In July, 1977 it was discovered that the platforms were not rigid enough and required extra support. The treadle plate correction work was performed between July 27–29, 1977. (Tr.T. Vol. 5, pp. 1455–58, Tr.T. Vol. 6, pp. 1564–68).

About two weeks later, in August 1977, Boschen forwarded his cost proposal to Mayfair, claiming 629 hours. Boschen's proposal to Mayfair contained the formula for determining the hours (G.Ex. 702). Akwa copied the hours onto Mayfair's submission to NASA, but deleted the formula. (G.Ex. 701).

The evidence at trial showed that the job was not difficult, and that only two iron-workers worked three to four days on the treadle plates. (Tr.T. Vol. 3, pp. 770–72, 863, Tr.T. Vol. 4, pp. 962–63, Tr.T. Vol. 5, pp. 1456–58, Tr.T. Vol. 6, p. 1568). Man-hour budget sheets showed a total of 281 hours for reworking treadle plates between July 20 and August 2. (Tr.T. Vol. 6, pp. 1570–72). Time cards showed that, with the exception of an unrelated task involving handrails, the total labor on the entire OPF during the relevant time period amounted to only 540 hours, 89 hours fewer than claimed on the treadle plate cost proposal alone. (Tr.T. Vol. 6, pp. 1568–70). Once again Mayfair's job superintendent, Red Walling, found the hours submitted for the change work to be excessive. (Tr.T. Vol. 3, p. 864).

DC 202 (Count 8): [12]

DC 202 involved the repair of actuator seals on hydraulic mechanisms designed to raise and lower platforms on the rear swing gates of the OPF. The actuators on the mechanisms did not work and were removed to replace the dried out seals. After virtually all the other contract work was completed, workers removed the actuators in January, 1978 and replaced them in May.

Boschen submitted a draft for the work to Akwa, claiming 152 hours. His estimate apparently was arrived at by doubling the 76 hours that, records reflected, it took to remove the actuators in January. (Tr.T. Vol. 6, pp. 1577–80). On May 1, 1978 Akwa forwarded a cost proposal to NASA for the work that claimed 152 hours. On May 18, 1978, before New World replaced the actuators, Akwa submitted a revised statement, increasing the claimed labor hours to 506 hours (G.Ex. 803). Although he had not received anything further from Boschen in the meantime, he represented in a cover letter accompanying this second submission that the increased hours reflected "a review of the manhours expended" on removal and "the prospect of similar time expenditures" to replace the actuators. Three months later, after the actuators were replaced, Akwa again resubmitted his statement for 506 hours (G.Ex. 801).

A review of the timecards and the certified payroll indicated that only 76 hours were expended by ironworkers in removing the actuators and only 76.5 hours were needed to replace them. (Tr.T. Vol. 6, pp. 1579–81). The total 152.5 hours was almost identical to Boschen's original submission, and less than one-third of Akwa's final detailed cost breakdown.

DC 48 and 130 (Counts 5 and 6): [13]

Work on these changes involved adjustments for side warpage on the MLP, a large structure that sits atop a "crawler"

---

11. Count 4 relates to the January 20 submission and not to the revised March 20 submission.

12. This count was charged against only appellants Akwa and Capital.

13. Appellant White was convicted on these counts, along with Akwa, Boschen, Capital, and New World.

which carries the shuttle to the launch pad. Work began on the changes in May, 1977 with most of the work completed by September, and all work completed by December.

Part of the normal contract work involved welding stiffener bars to the outside of the MLP to hold pipes and pipe supports. During construction it was discovered that three of the sides were warped; as a result the stiffeners had to be cut and filled to fit the warp. Appellants submitted separate cost statements in connection with this change work. The first sought payment for correction of sides one and four (Count 5), and the second related to side two (Count 6). The first submissions (G.Exs. 506, 606) occurred shortly after the change work was finished; then about two months after completion of the contract revised proposals were submitted, these new proposals approximately doubled the dollar amounts originally requested. (G.Exs. 508, 608). Appellants claimed approximately 5,600 hours for sides one and four (Count 5) and approximately 4,400 hours for side two (Count 6), for a total of approximately 10,000 hours. The government's evidence established that the actual hours for both changes was substantially less than submitted in the cost proposals, even taking into account the alterations to time cards made by appellant White. (Tr.T. Vol. 9, pp. 2313–33).[14]

Akwa informed NASA in his first proposals that the total hours were arrived at through the use of a formula and factoring. Although the subsequent revisions submitted by White to Akwa maintained the same formulas and factors, Akwa once again failed to include that information in his final submissions, even though NASA required the disclosure of formulas or other methods used in determining costs where the proposals exceeded $100,000.[15] Moreover, prior to commencement of the change work for warpage, NASA had directed Mayfair and New World supervisors and employees to keep track of their hours on the change work. (Tr.T. Vol. 7, pp. 1801–02). Furthermore, during negotiations Boschen represented to NASA that accurate records were being kept and that there would be no difficulty later ascertaining the number of hours spent on the change orders. (Tr.T. Vol. 9, p. 2162).

As to White, there was evidence that White revised initial drafts of change order costs at Boschen's direction because they did not reflect enough hours. White then examined the time cards and altered them in an attempt to substantiate the hours billed on the cost proposal. The number of hours found by White fell far short of the cost proposal. Moreover, the hours submitted to White by an ironworker with responsibility for the change work reflected significantly fewer hours than those proposed by White. Consequently, White submitted his estimates with knowledge that the actual work records did not reflect the hours claimed.

DC 390 (Count 10):

DC 390 was a proposal for extended overhead and impact costs. In February 1979, a year after completion of the entire MLP contract, Akwa submitted a cost statement seeking reimbursement of $1,456,506 for extended overhead and impact. Extended overhead and impact claims are permissible means for seeking reimbursement of secondary costs that are generally attributed to delay and change orders but cannot be particularly assigned.

Boschen prepared a draft proposal that multiplied the labor hours by a factor of 47 percent to calculate costs attributable to such things as "loss of efficiency" and "idle time or lost productive time" resulting from change orders. In his draft to Akwa, Boschen allocated 12,457 impact hours specifically attributable to ironwork-

---

**14.** The government's evidence showed that actual records of hours totaled no more than 2,000–3,000 hours for both changes, even accepting the time card alterations. Also, the final submission by Akwa had been computed by White using factors for acceleration and weather. These factors were not contained in the final proposal and were thus presented as straight labor hours to NASA.

**15.** Both submissions for DC 48 and DC 130 exceeded $100,000.

er labor, and separately allocated more than 3,000 supervisor and foreman hours. (G.Ex. 1002). In fact, the 12,457 hours, which equaled 47 percent of the total 27,034 hours on the certified payroll, included all categories of work, including foremen and supervisors. (Tr.T. Vol. 10, pp. 2354–55). As a result, by including more than 3,000 additional supervisor and foreman hours, Boschen charged NASA twice for impact hours related to supervisory employees. Akwa submitted Boschen's figures without disclosing Boschen's method of calculation.

We have conducted a thorough review of the evidence. The government's evidence that the proposals submitted by the appellants were inflated when compared to actual hours is, frankly, overwhelming. Though the government admits, and we agree, that it is impossible to determine exactly how many hours were spent on change work, the great disparities between the proposals submitted and the hours actually worked convinces us that the appellants' proposals were consistently overinflated. Indeed, in most cases, the proposals were double the actual hours shown and in many cases were several times the actual hours indicated by the records.

The appellants contend that the disparity shown between actual hours and the proposals submitted is essentially irrelevant because the proposals submitted were in all instances only estimates, represented to NASA to be only estimates, and accepted and negotiated by NASA as only estimates. Consequently, appellants argue that the key element of § 1001 has not been met, *e.g.*, the knowing submission of a false statement, because the proposals submitted were estimates subject to negotiation and therefore, regardless of the actual hours later shown, the proposals submitted by being labeled estimates negated any possible finding of falsity. It is to this contention that we now turn.

*The Defense Case*

The appellants contend that the cost estimates were prepared in conformity with the requirements of NASA contracts, NASA negotiating procedure, industry practice and were reasonable in light of the established course of conduct between NASA and Mayfair. Appellants argue that it cannot be disputed that NASA was fully aware that Mayfair's cost estimates were submitted as estimates of labor and material costs because each cost estimate was submitted on a form entitled "Estimate Summary for Change Orders."

Appellants maintained at trial and on appeal that the estimating practices utilized conformed to standard industry practice, and that labor and material costs were estimated from the estimator's experience and not from actual work records.[16]

Moreover, appellants urge that NASA was aware of and did not object to this estimating practice, that NASA promulgated no guidelines for contractors to follow in preparing cost estimates; nor did the NASA contracts require that costs be estimated in a particular manner. Appellants point out that NASA had similar estimating practices that did not necessarily rely upon actual time records. Also, that NASA would establish high, medium and low target estimates for purposes of negotiation.

Appellant Akwa asserts that even assuming the eight cost estimates were false, there was no evidence that Akwa knew they were false since New World employees prepared the estimates and Akwa simply passed these estimates on to NASA. Likewise, Akwa asserts that there was no evidence that he submitted these estimates to NASA with an intent to deceive. Appellant Boschen contends that the government failed to prove that he knew the submissions made to NASA were false and further asserts that the government failed to prove that before submitting the estimate

---

**16.** Appellants' claim that timecards, daily reports or other data reflecting actual work performed were not used in estimating was directly contradicted by the evidence presented at trial. (Tr.T. Vol. 11, pp. 2746–49, Tr.T. Vol. 13, pp. 3210, 3218, 3237, 3259–60). Moreover, evidence was introduced that New World estimators reviewed timecards and daily logs after their cost proposal submissions, but prior to negotiations. (Tr.T. Vol. 11, pp. 2691, 2765–73, 2781–84).

Boschen had a duty to ascertain the extent of actual labor and material expenses.

### The Evidence Was Sufficient to Support the Convictions on All Counts

Appellants cite *United States v. Race,* 632 F.2d 1114 (4th Cir.1980) and *United States v. Anderson,* 579 F.2d 455 (8th Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978) for the proposition that one cannot be found guilty of a false statement if the statement made is within the boundaries of a reasonable construction of the contract. Appellants' citation to these cases is unavailing. In *Race* the contract required the government to pay the contractor per diem allowances for its employees in accordance with a regulation that authorized such payments at a daily rate of $33. The defendants billed for the $33 reimbursement, even though each employee was paid only $25. The court of appeals reversed the convictions, finding that the contract, when read literally, permitted billing at the regulation rate, and that there had been no prior conduct that would allow a different interpretation of the contract.

In *Anderson* the defendant was prosecuted for making a false statement in response to an arguably ambiguous phrase on a certification agreement. The court of appeals held that the contract could be reasonably construed in a manner that would make defendant's certification statement truthful. Given the ambiguous nature of the contract, the court imposed upon the government the burden of proving "the falsity of the statement as well as the defendant's knowing and willful submission." 579 F.2d at 460. The court also required the government to negate "any reasonable interpretation that would make the defendant's statement literally true." *Id.*

In the above cases the defendants made very specific representations as required by the contract. The courts found their representations to be truthful based upon a reasonable interpretation of the contract. The evidence does not support the appellants' attempt to make the same claim in this case. Clause 3 of the subject contract stated that equitable adjustments for change work will be made for reasonably incurred costs, and Section VII, Art. 1 of each contract required Mayfair to furnish a "price breakdown" that was "itemized ... in sufficient detail to permit an analysis of all material, labor, [and] equipment...." Moreover, further instructions were set out on the back of the DD 633 certification forms that are required to be submitted by contractors whenever their cost proposals exceed $100,000. In this case appellant Akwa signed DD 633 forms in connection with the cost proposals charged in Counts 3, 5, 6, 8 and 10. Paragraph 1 of the instructions on the back of the form explained that "the purpose of this form is to provide a standard format by which the offeror submits to the Government a summary of incurred and estimated costs (and attached supporting information)...." As part of the certification requirement, the DD 633 forms imposed upon Akwa a further legal obligation to inform NASA of any formula or factoring methods that he used to arrive at the proposed hours. Paragraph 2 of the instructions explicitly states that:

> "the offeror must submit with this form, and clearly identify as such, cost or pricing data *(that is, data which is verifiable and factual and otherwise as defined in NASA PR 3.807–3(e)*). In addition, he must submit with this form any information reasonably required to explain the offeror's estimating process, including:
>
> a. The judgmental factors applied and the mathematical or other methods used in the estimate including those used in projecting from known data...." (emphasis in original).

In all instances appellant Akwa failed to include the factors and formulas used by Boschen and other New World estimators in arriving at the cost proposals. Moreover, both Akwa and Boschen made specific representations that their submissions were based on actual hours and that they had specific documentation to back up those figures. However, such documentation was never forthcoming and, indeed, the later alteration of timecards by New

World put Boschen on notice that his submissions were grossly overinflated. Based upon the evidence the jury could have reasonably found that the submissions made by appellants did not reflect reasonably incurred expenses and constituted false statements that were knowingly submitted as false.

In fact, the principal case relied upon by appellants, *Maxwell v. United States*, 277 F.2d 481 (6th Cir.1960), when compared with the facts of this case, demonstrates the bad faith and conscious disregard of the truth engaged in by the appellants here.

In *Maxwell* the defendant submitted a claim for costs after the government terminated his fixed price contract. The defendant was not previously on notice that he should keep track of actual costs in order to seek reimbursement later for unanticipated expenses resulting from the government's premature termination. Consequently, he did not maintain precise records. The appellants argue that they are in an identical posture, given the fixed price nature of the contract. However, as illustrated below, the appellants' culpability stems from the deceitful manner in which their estimates were presented to the government versus the forthright approach taken by the defendant in *Maxwell*.

In *Maxwell* the defendant repeatedly expressed to the government that his submissions were purely estimates and that the numbers were not reflected in the companies' books. 277 F.2d at 486. The following passages from *Maxwell* indicate the reasoning behind the court of appeals' reversal of the conviction:

> Government counsel argued that even if the figures in question were estimates of Maxwell, "the estimates had to be based on fact, not fiction, and on some records or base." In the same connection, the trial court stated that "if Mr. Maxwell and the Algonac Manufacturing Company lacked the specific data with which to justify a cost basis for these items, then

it was incumbent upon them to say so, and not manufacture the data out of thin air."

 \*　　\*　　\*　　\*　　\*　　\*

> [I]t is sufficient to say that it is undisputed that Mr. Maxwell told the government officials, at the beginning of the controversy, that he lacked the specific data with which to justify a cost basis for these items; that he could not answer the questions as to costs of "tool and die" items; that the figure submitted by him was only an estimate; that the books were not set up to show such cost items and that such costs could not be ascertained from the books and records, a conclusion in which all the government witnesses concurred.

277 F.2d at 509.

The facts in this case compel a different conclusion. Even accepting arguendo the appellants' contention that the records kept on the contract were inadequate to ascertain actual hours or costs expended on the change orders, their actions belie their claim that they submitted truthful estimates for the purpose of honest negotiations. The evidence is uncontradicted that both appellants represented to the government that their submissions reflected "actual hours." The evidence is uncontradicted that the submissions to NASA deleted all formulas and factors used to derive the cost proposals, and that both Akwa and Boschen knew of these deletions. The evidence showed that both Boschen and White reviewed timecards on several of the proposals either before or after submissions and were aware that the hours submitted in no way reflected the actual hours shown on the timecards. The evidence showed that both Akwa and Boschen represented to NASA that the figures had a basis in their records, that they would supply those records to NASA, and then failed to do so. The evidence is uncontradicted that Akwa in two letters during June and July of 1977 represented that Mayfair was aiding in the preparation of cost proposals and reviewing them in detail.[17] The evidence is uncon-

---

17. In a letter to NASA dated June 23, 1977 Akwa stated:

> [I]t is often necessary to not only review the subcontractors change order cost proposals but to aid in their preparation. The delays in

tradicted that Akwa took New World's direct labor and material costs and submitted them to NASA as Mayfair's direct costs, and that Boschen had knowledge of the format of these submittals. Additionally, the evidence showed that the charge for field support was intended to cover the overhead and impact costs of New World, whose role in the actual steel erection was being hidden from NASA. The jury could have reasonably concluded that this field support charge was a false statement knowingly intended to deceive the government. In fact, we find that the format of these submissions alone, which purposely obscured the true relation between Mayfair and New World, were sufficient to uphold the convictions against Akwa and Boschen on all eight false statement counts.

We are not here faced with the situation in *Maxwell* where a contractor was suddenly surprised by a government termination and had no basis for substantiating his previously incurred costs. Rather, we have an experienced general contractor, Mr. Akwa, who had previously performed work on NASA projects. It is axiomatic that contract work of this scale and complexity will involve substantial change orders. It is also axiomatic that determining the exact

cost of those changes is difficult and that negotiations over these costs must take place. However, a contractor may not invoke the terms "estimates" and "negotiation" to justify a willful attempt to fleece the system.[18]

■ There is a line between estimates which reflect reasonably incurred expenses and estimates which are so grossly inflated when compared to actual costs that they are by their very nature fraudulent. That line has been crossed in this case. A review of the actual hours in this case demonstrates that the appellants' cost proposals were consistently overinflated, at times by 100 percent or more. All final submissions of the cost proposals were made after the change work was completed. Appellants strenuously contend that this fact is of no consequence because the estimates were based solely on formulas using drawings and specifications. However, the evidence showed that timecards (which had specific notations of different change orders), daily logs and supervisor reports were readily available. Even if the estimates were truly based on mathematical formula, appellants had a duty to make sure that they reflected reasonably incurred costs. Checking available physical

submitting change order cost proposals have generally resulted from delays in obtaining good cost data from these subcontractors. Every effort is being made by Mayfair to expedite the submittal of cost estimates with sufficient backup detail for proposal evaluation.

Additionally, Mayfair will in the future submit a certification of their review and any review comments which might aid the Government in their evaluation.

In a letter dated July 15, 1977 Akwa stated:
The purpose of this letter is to outline briefly the steps which we take in preparing an estimate for change to any of our government contracts. Upon receiving a DC or CO, a thorough review is made by our engineering staff; and a scope of work is prepared listing the work to be accomplished by Mayfair Construction Company forces and the work to be done by our subcontractors. At the same time, a tentative estimate is prepared for in-house use only, which is compared against the estimates prepared by our subcontractors.

Upon receipt of proposals from our subcontractors, the writer, and only the writer, compares the proposals against Mayfair Construc-

tion Company's estimate. These proposals are reviewed in great detail, because we have determined that the majority of subcontractors are not sophisticated in dealing with government contracts, and almost without exception their proposals are lacking the cost items which are recoverable under NASA procurement regulations. We feel morally bound to protect our subcontractors and to make sure they are equitably compensated for their efforts.

18. We find a comparable situation in *United States v. Collins*, 596 F.2d 166, 168 (6th Cir. 1979):
The testimony was that Collins' salary claims were inflated by as much as 100% over the amount to which he could reasonably have thought himself entitled. In our view, that was strong evidence of his fraudulent intent. We think the jury could reasonably have concluded that, in submitting the grossly overstated salary figures, Collins was not so much interested in presenting a bold negotiating posture for purposes of later bargaining with the state over an equitable settlement as he was in fleecing the system.

data on change orders was the obvious means to accomplish this end. The appellants' avowed failure to do so evidenced a reckless disregard of the truth, with a conscious purpose to avoid learning the truth. Such action is sufficient to show that a false statement was made knowingly or willfully. *See United States v. Lange,* 528 F.2d 1280, 1288 (5th Cir.1976).

More importantly, as we have previously noted, the appellants' contention that they relied solely on mathematical formulas is strongly contradicted by evidence of their representation during negotiation that their proposals contained actual hours and that documentation existed for their proposals. Additionally, they failed to include the alleged formulas and factors in their cost proposal submissions to NASA. In negotiating with the government, contractors cannot play both sides of the net, claiming during negotiations that their estimates reflect real costs, but then upon discovery of their falsity claim that they were indeed only rough estimates. Negotiation over change orders invariably must involve a great deal of give and take, with high and low figures; but these figures must be honestly arrived at and not knowingly inflated in a willful attempt to mislead the government as to actual costs incurred.

It is no defense that NASA was willing to negotiate on these cost proposals and viewed them primarily as estimates. The false statement need not actually defraud the government. It is sufficient that the false statement is capable of affecting or influencing a governmental function. *See United States v. Fern,* 696 F.2d 1269, 1273 (11th Cir.1983). Nor is it important whether the government believes the statement to be true or false. It is only the defendant's scienter that is relevant. Finally, the fact that the government may have negotiated estimates that were similarly overinflated in the past does not make available the defense of "active misleading" by the government. As stated by this court previously:

> [G]overnmental silence is not "affirmative assurance that punishment will not attach" and a mere absence of prior prosecutions does not constitute "active mis-

leading" even in the face of widespread practice of the proscribed activity.

*United States v. Lichenstein,* 610 F.2d at 1279, *quoting United States v. Mann,* 517 F.2d 259, 270 (5th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 97 L.Ed.2d 97 (1976).

██ The evidence recited above and found in the record provides ample support for the conspiracy convictions and the finding of guilt as to Counts 2 and 3 necessitate the affirmance of the false claim conviction under Count 9. Accordingly, we affirm the convictions by the district court as to all Counts and parties.

AFFIRMED.